# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

PLANNED PARENTHOOD OF
MARYLAND, INC.,
330 N. Howard Street
Baltimore, MD 21201
(Resident of Baltimore City),

KIRSTY HAMBRICK,
c/o Andrew D. Freeman
Brown, Goldstein & Levy, LLP
120 E. Baltimore Street, Ste. 1700
Baltimore, MD 21202
(Resident of Baltimore City),

REBECCA BARSON,
c/o Andrew D. Freeman
Brown, Goldstein & Levy, LLP
120 E. Baltimore Street, Ste. 1700
Baltimore, MD 21202
(Out-of-state resident),

MARIEL DIDATO,
c/o Andrew D. Freeman
Brown, Goldstein & Levy, LLP
120 E. Baltimore Street, Ste. 1700
Baltimore, MD 21202
(Out-of-state resident), and

TANJA HOLLANDER,
c/o Andrew D. Freeman
Brown, Goldstein & Levy, LLP
120 E. Baltimore Street, Ste. 1700
Baltimore, MD 21202
(Out-of-state resident),

        *Plaintiffs*,

    v.

ALEX M. AZAR II, Secretary of the United
States Department of Health and Human
Services, in his official capacity,
200 Independence Avenue SW,
Washington, DC 20201,

Civil Action No. 1:20-cv-00361

U.S. DEPARTMENT OF HEALTH AND
HUMAN SERVICES,
200 Independence Avenue SW,
Washington, DC 20201,

SEEMA VERMA, Administrator of the
Centers for Medicare and Medicaid Services,
in her official capacity,
7500 Security Boulevard
Baltimore, MD 21244,

CENTERS FOR MEDICARE AND
MEDICAID SERVICES,
7500 Security Boulevard
Baltimore, MD 21244,

*Defendants*.

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

1.      This case is an Administrative Procedure Act ("APA") challenge to a federal rule

that Defendants admit will impose more than $1.26 billion in costs on the public and reduce the

availability and affordability of health insurance for three million consumers nationwide, including

more than 156,000 Maryland residents, and that will do so with no countervailing benefits. *See*

Patient Protection and Affordable Care Act; Exchange Program Integrity, Final Rule, 84 Fed. Reg.

71,674 (Dec. 27, 2019) (to be codified at 45 C.F.R. pts. 155, 156); Patient Protection and

Affordable Care Act; Exchange Program Integrity, Notice of Correction, 85 Fed. Reg. 2,888 (Jan.

17, 2020) (collectively, "the Final Rule" or "the Separate-Billing Rule"). The Separate-Billing

Rule, which was adopted by the U.S. Department of Health and Human Services ("HHS") and the

U.S. Centers for Medicare and Medicaid Services ("CMS"), will become effective on February

25, 2020, and require implementation by June 27, 2020. It will lead to an increase in consumer

premiums, a narrowing of the scope of covered benefits under health insurance plans, and

inadvertent policy terminations for unsuspecting consumers. And it will do all of this in direct contravention of the Patient Protection and Affordable Care Act ("ACA").

2.      Specifically, the Separate-Billing Rule purports to reinterpret Section 1303 of the ACA, 42 U.S.C. § 18023, a provision establishing special rules for coverage of abortion care in insurance plans offered through ACA health benefit exchanges. Under Section 1303, consumers who purchase an individual-market insurance plan on one of the ACA's exchanges may purchase a plan that covers abortion care, if that coverage is permitted or required by the laws of their state and offered by an insurer there. However, the ACA currently bars those consumers from using any federal subsidies to pay for abortion coverage (except in narrow circumstances). The statute, therefore, requires insurers offering exchange plans with abortion coverage (hereinafter "issuers") to collect separate payments from consumers and establish separate accounts for the deposit of those payments—one account for the portion of a premium attributable to federally excluded abortion services, and one for all other coverage under a plan (hereinafter, the "separate-accounting requirement"). Federal subsidies established by the ACA to assist consumers with insurance costs may only be used to offset the non-abortion-related portion of a consumer's premium.

3.      Prior to the Final Rule, HHS regulations and guidance provided issuers and consumers options for complying with the separate-accounting requirement. Issuers could, for example, provide consumers with a single premium bill that identified the abortion-related portion of the premium as a line item, as is customary in the insurance industry for other types of charges. Consumers could then pay the abortion-related and other premium payments in a single transaction, which issuers would disaggregate and place in separate accounts upon receipt. Issuers could also comply with Section 1303 by advising consumers at the time of enrollment that a portion of the premium was for abortion-related services and could not be funded through federal

subsidies, and issuers would then disaggregate consumers' monthly payments made through a single transaction and place them in separate accounts.

4.      The Separate-Billing Rule, by contrast, creates recurring red tape that will affect roughly one-third of the individual-market exchange plans nationwide, including every plan in Maryland. Specifically, the Final Rule requires issuers providing abortion coverage in an individual-market plan on an exchange to send two separate paper or electronic bills to consumers each month—one for the abortion-related portion of their premium and the other for all other coverage—beginning in June 2020. Those issuers must also begin telling consumers to pay their premium in two separate transactions, thus requiring consumers to submit two checks or money orders or make two electronic payments every month.

5.      The Final Rule also adopts a new policy of non-enforcement never suggested in the proposed rule. Starting on February 25, 2020, HHS will not take enforcement action against issuers that allow consumers who purchase plans with abortion coverage to opt out of only that portion of the coverage on behalf of themselves and their families. This blanket opt-out policy, which is contrary to the ACA's requirement that plans covering abortion collect from *each enrollee* an abortion-related premium, will leave remaining plan participants and issuers to shoulder the costs.

6.      Although the current administration regularly touts its efforts to "cut[] federal red tape,"[1] HHS readily admits that the Final Rule does the opposite. Defendants acknowledged that the Rule will impose $1.26 billion in costs on the public by the end of 2024 and will reduce the availability and affordability of health insurance for more than three million consumers

---

[1] Remarks by President Trump and Vice President Pence in a Roundtable on Small Business and Red Tape Reduction Accomplishments (Dec. 6, 2019), https://www.whitehouse.gov/briefings-statements/remarks-president-trump-vice-president-pence-roundtable-small-business-red-tape-reduction-accomplishments/.

nationwide. HHS has not identified a *single* quantifiable benefit from the Final Rule to weigh in the balance against these costs. Even the $1.26 billion estimate is wildly underinclusive. The Final Rule ignores record evidence regarding numerous quantifiable costs to consumers and other members of the public, including the time and cost to consumers of paying two separate bills per month, every month.

7.     HHS concedes that the ACA does not require the Separate-Billing Rule and that the rule is not based on evidence of issuers' non-compliance with the ACA's separate-accounting requirement. Instead, the Final Rule is clearly designed to reduce consumer participation in plans that offer abortion coverage, and in states where it is permissible, to reduce the number of plans that do so, accomplishing by regulation what Congress refused to do when it adopted the ACA. As one paper in the record explained, "[t]his rule is consistent with the Trump Administration's stated priority to limit abortion access" and "could further erode the availability of coverage for a health service that many [patients] need and use." Kaiser Family Found., *Abortion Coverage in the ACA Marketplace Plans: The Impact of Proposed Rules for Consumers, Insurers and Regulators* 6 (2018), *attached to* Comment of the Attorney General of California, et al. (Jan. 8, 2019), CMS-2018-0135-73336.[2]

8.     The Final Rule will impose devastating and irreparable harms on consumers, insurers, and healthcare providers nationwide, including Plaintiffs, who are consumers with exchange-based private insurance that includes abortion coverage and a provider of comprehensive reproductive health care services, including abortion. The Final Rule will induce issuers to drop insurance coverage for abortion in order to avoid the rule's administrative costs and will lead to a

---

[2] The administrative docket for the Final Rule, which includes comments on the Proposed Rule, is available at https://www.regulations.gov/docket?D=CMS-2018-0135.

rise in premiums for those consumers with plans that maintain abortion coverage. Those individuals who lose abortion coverage will incur large out-of-pocket costs to obtain abortion care, and may be prevented from accessing abortion altogether. The rule will also engender widespread consumer confusion that—as HHS recognizes—will result in some consumers not paying the abortion-related portion of their premium, and potentially being unable to obtain or maintain insurance coverage as a result. Loss of insurance, particularly among consumers who already struggle to pay their bills or have chronic or serious medical conditions, will have long-lasting, negative repercussions for consumers' health, well-being, and economic security.

9.      The Final Rule violates the Administrative Procedure Act ("APA") in at least three ways. First, HHS ignored significant data in the record regarding costs and set forth wholly illogical rationales to support the Final Rule's "benefits," which HHS failed to quantify. Second, the Final Rule conflicts with Sections 1303 and 1554 of the ACA, which forbid HHS from, among other things, adopting regulations that create any unreasonable barriers to the ability of individuals to obtain health insurance coverage on the exchanges. Third, the Final Rule adopts an opt-out policy with respect to abortion coverage without notice and an opportunity for public comment, as required by the APA. *See* 5 U.S.C. §§ 553, 706. Accordingly, Plaintiffs ask this Court to declare the Final Rule unlawful and set it aside immediately upon judgment.

## JURISDICTION AND VENUE

10.      This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1346 (2018). The Court is authorized to issue the relief sought here under the APA, 5 U.S.C. §§ 702, 704–706, the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202 (2018), Rules 57 and 65 of the Federal Rules of Civil Procedure, and the Court's inherent equitable powers.

11.      Venue is proper in this district because Defendants CMS and Seema Verma and Plaintiffs Planned Parenthood of Maryland, Inc. and Kirsty Hambrick reside in Maryland, and

because a substantial part of the acts or omissions giving rise to the claims occurred in Maryland. 28 U.S.C. § 1391(c)(2), (e)(1).

12.     Under District of Maryland Local Rule 501.4(a) & (b), this case should be assigned to the Northern Division because it involves agencies of the United States as Defendants and the two plaintiffs who are Maryland residents, Planned Parenthood of Maryland, Inc. and Kirsty Hambrick, are both residents of the Northern Division (Baltimore City).

## PARTIES

13.     Plaintiff Planned Parenthood of Maryland, Inc. ("PPM") is a non-profit corporation incorporated in Maryland with its principal offices in Baltimore, Maryland. PPM operates seven Maryland health centers, where it provides comprehensive reproductive health care services, including birth control; testing and treatment for sexually transmitted infections ("STIs"); testing for HIV and the human papillomavirus ("HPV"); pregnancy testing and prenatal referrals; breast and cervical cancer screenings; and safe, legal abortion. PPM accepts insurance coverage from and provides care, including abortion care, to patients who rely on individual insurance plans under the Maryland exchange.

14.     Plaintiff Kirsty Hambrick works full-time as a barista and is a resident of Baltimore, Maryland. They purchase their insurance on the individual market of Maryland's health insurance exchange. Their current plan includes abortion coverage, which Hambrick wishes to maintain. Hambrick is a person of reproductive age capable of becoming pregnant and may need abortion care.

15.     Plaintiff Rebecca Barson is a small business owner and resident of Washington, DC. She purchases her insurance on the individual market of DC's Health Benefit Exchange (HBX). Her current plan includes abortion coverage, which she wishes to maintain. Ms. Barson is a person of reproductive age capable of becoming pregnant and may need abortion care. Ms.

Barson also currently serves as the consumer representative on the DC HBX Standing Advisory Board, which advises the HBX Authority's Executive Board. The Advisory Board on which Ms. Barson serves makes recommendations on such topics as insurance standards, covered benefits, premiums, plans, technology system development, and other policy or operational issues.

16.     Plaintiff Mariel DiDato is a graduate student who works part-time as a waitress. She is a resident of Hazlet, New Jersey. She purchases her insurance on the individual market of New Jersey's health insurance exchange. Her current plan includes abortion coverage, which she wishes to maintain. Ms. DiDato is a person of reproductive age capable of becoming pregnant and may need abortion care.

17.     Plaintiff Tanja Hollander is a self-employed artist and a resident of Auburn, Maine. She purchases her insurance on the individual market of Maine's health insurance exchange. Her current plan includes abortion coverage, which is required under Maine state law. *See* Me. Rev. Stat. tit. 24-A, § 4320-D, 4320-M. Ms. Hollander is a person of reproductive age capable of becoming pregnant and may need abortion care.

18.     Defendant Alex Azar is the Secretary of Health and Human Services and is charged with the supervision and management of all decisions and actions within HHS. Plaintiffs sue Secretary Azar in his official capacity.

19.     Defendant HHS is an agency of the United States within the meaning of the APA. It is responsible for overseeing and adopting implementing regulations for Title 1, subtitle D, of the ACA, including the Final Rule.

20.     Defendant Seema Verma is the Administrator of CMS and is charged with the supervision and management of all decisions and actions within CMS. Plaintiffs sue Administrator Verma in her official capacity.

21.     Defendant CMS is an agency of the United States within the meaning of the APA. Along with HHS, it was responsible for adopting the Final Rule.

## BACKGROUND

**I.     Section 1303 of the Patient Protection and Affordable Care Act**

22.     Congress adopted the ACA in 2010 to make healthcare more affordable and available in the United States. To that end, the ACA mandated, among other things, the creation of health insurance exchanges or "marketplaces." Today, consumers may use these exchanges to compare and directly enroll in public health insurance programs, where eligible, and private health insurance plans offered by issuers participating in an exchange. The ACA's creation of the exchanges helped ensure that individuals could obtain private health insurance even if they lacked access to group coverage, such as insurance provided by an employer, or were ineligible for public insurance programs like Medicaid or Medicare. This case concerns individual-market plans sold on the exchanges, which are designed for and open to individual policy holders and their families, as distinguished from other private plans offered on an exchange to small businesses.

23.     The structure of ACA exchanges varies by state. Some exchanges are state-based, meaning that an individual state has opted to take responsibility for operating the exchange. To date, nineteen states, including Maryland, and the District of Columbia have such exchanges. HHS also operates federally-facilitated exchanges—available at www.healthcare.gov—for the thirty-one states that have not created their own exchanges. Depending on the state's preference, HHS may operate the exchanges on its own or in conjunction with the state.

24.     Health insurers are not required to participate in the ACA exchanges. Those that do, however, must offer Qualified Health Plans, meaning that the plans provide certain essential health benefits to consumers. *See* 42 U.S.C. § 18021 (2018). In addition, issuers participating in the exchanges must meet numerous other federal requirements, including complying with the

8

Medical Loss Ratio ("MLR") provision of the ACA intended to keep administrative costs down. Under that provision, issuers must spend at least eighty percent of premiums that they receive from an exchange plan on medical claims and quality improvement, and no more than twenty percent on administration, marketing, and profit. *Id.* § 300gg-18; *see also* 45 C.F.R. § 158.210.

25.     Issuers that seek to offer plans on an exchange will generally propose premiums and benefits covered by those plans by July 1 of the year prior to coverage, and in some states even earlier. The "open enrollment" period for consumers to purchase those plans will occur in the fall prior to the plan year, which runs from January 1 to December 31. Absent one of the few reasons that justify enrollment mid-year, consumers may not enroll in a plan outside of the open enrollment period set by their respective exchange.

26.     To help offset the cost of coverage to consumers, the ACA provided federal subsidies for income-eligible individuals who purchase insurance through the exchanges. Those subsidies include Advance Premium Tax Credits ("APTCs"), which consumers can use to reduce their monthly premiums. APTCs are generally only available to households with incomes between 100 and 400 percent of the federal poverty level. 42 U.S.C. § 18071 (2018).

27.     In Section 1303 of the ACA, Congress addressed whether issuers selling individual-market insurance plans on the exchanges could cover abortion services. It expected that many consumers purchasing exchange plans would rely on federal subsidies to pay their premiums, which are funded by appropriations to HHS. At the time of the ACA's passage, federal law prohibited—as it still does today—the use of funds appropriated to HHS (and the Departments of Labor and Education) to pay for abortion care. Although this funding restriction, known as the "Hyde Amendment" for its original House sponsor, is not permanent, it has been attached to recurring federal appropriations legislation for affected agencies since 1976. The Hyde

Amendment, in its current form, contains a limited exception that permits the use of federal funds for abortion services where a pregnancy is the result of rape or incest or threatens the life of the pregnant person. Pub. L. No. 115-245, div. B, tit. V, §§ 506–507 (2019). Federal funding for all other abortion care (hereinafter, "non-Hyde abortion care") is prohibited.

28.      For this reason, patients who rely on federally financed Medicaid, federal employee health insurance, and federal health care for servicemembers have generally not been able to turn to these programs to cover abortion services. However, they may still use their private funds or—where available—state funds for this purpose. The Hyde Amendment does not purport to affect what individuals or states can do with their own money. Nor does the Hyde Amendment apply to private insurance plans, many of which at the time of the ACA's enactment included coverage for abortion.

29.      Section 1303 was intended to preserve this status quo. The "Nelson Amendment," as the Senate version of Section 1303 was known during debate, was a compromise between legislators who wanted the ACA to further restrict abortion access in the exchanges and legislators who did not want to see the Hyde Amendment's prohibition applied to private plans on the exchanges.

30.      Section 1303 provides that, unless prohibited by state law, issuers may determine whether to extend abortion coverage in their insurance plans on the exchange. 42 U.S.C. § 18023. Currently twenty-six states prohibit abortion coverage in their health insurance marketplaces, five require it, and nineteen plus the District of Columbia leave to issuers the decision whether to extend such private coverage.[3]

---

[3] Kaiser Family Found., *State Restriction of Health Insurance Coverage of Abortion* (May 1, 2019), https://www.kff.org/womens-health-policy/state-indicator/abortion-restriction/?current

31.     Although Section 1303 does not expressly refer to the Hyde Amendment, it provides that an issuer cannot "use any amount attributable" to the ACA's federal subsidies to pay for abortion services where federal funds appropriated to HHS cannot be used for such services. 42 U.S.C. § 18023(b)(1)(B)(i). What federal law permits is based on the appropriations law in effect six months before the start of a plan year. *Id.* Section 1303 thus directs issuers to look to the underlying federal appropriations statute to see if the Hyde Amendment remains in effect before the plan year starts and to manage the use of federal subsidies accordingly.

32.     Section 1303 established the separate-accounting requirement to implement this prohibition on the use of federal funds for plan premiums attributable to non-Hyde abortion care.

33.     Specifically, in a subsection entitled "Prohibition on the use of federal funds," the statute requires issuers that offer non-Hyde Amendment abortion coverage to "collect from each enrollee in the plan . . . a separate payment" for: (1) an amount equal to the premium for coverage of non-Hyde abortion care; and (2) an amount equal to the premium for all other services under the plan, after accounting for the enrollee's receipt of federal subsidies. *Id.* § 18023(b)(2)(B). Issuers must then deposit "all such separate payments into separate allocation accounts," one that is "used exclusively to pay for [non-Hyde abortion] services," and the other that is used exclusively to pay for all other covered services. *Id.* § 18023(b)(2)(B)(ii), (C)(ii).

34.     Section 1303 requires that issuers estimate the abortion-related premium cost "as if such coverage were included for the entire population covered," and issuers cannot estimate the premium to be "less than $1 per enrollee, per month." *Id.* § 18023(b)(2)(D)(ii).

---

Timeframe=0&sortModel=%7B%22colId%22:%22Private%20Insurance%20Plans%20Restrict%20Abortion%20Coverage%3F%22,%22sort%22:%22desc%22%7D.

35.     In a separate subsection, Section 1303 also establishes "[r]ules relating to notice" of a plan's abortion coverage. Under those rules, an exchange plan that provides coverage of non-Hyde abortion care "shall provide a notice to enrollees, *only* as part of the summary of benefits and coverage explanation, at the time of enrollment, of such coverage." *Id.* § 18023(b)(3)(A) (emphasis added).

36.     That notice, along with "any advertising used by the issuer with respect to the plan, any information provided by the Exchange, and any other information specified by" HHS "shall provide information *only* with respect to the total amount of the combined payments for [non-Hyde abortion services] and other services covered by the plan." *Id.* § 18023(b)(3)(B) (emphasis added).

37.     These notice provisions constrain the ways in which HHS may require issuers or exchanges to tell consumers about the inclusion of abortion coverage in their plans and the cost of that coverage.

## II.     Initial Regulations and Guidance Implementing Section 1303

38.     In 2012, HHS adopted regulations to implement Section 1303. *See* HHS, Patient Protection and Affordable Care Act; Establishment of Exchanges and Qualified Health Plans; Exchange Standards for Employers, 77 Fed. Reg. 18,310, 18,439–40 (Mar. 27, 2012) (codified at 45 C.F.R. pts. 155–157). The 2012 regulations, which largely repeated the statutory language, left issuers with wide discretion in terms of how to comply with the ACA's separate-accounting requirement.

39.     ACA exchanges became operational in the 2014 plan year. In a 2015 rule, HHS provided further guidance on implementing Section 1303, while emphasizing that the statute did not "specify the method an issuer must use to comply with the separate payment requirement." Patient Protection and Affordable Care Act; HHS Notice of Benefit and Payment Parameters for 2016, 80 Fed. Reg. 10,750, 10,840 (Feb. 27, 2015) (codified at 45 C.F.R. pts. 144, 147, 153–56,

and 158). Instead, HHS explained that issuers could satisfy this requirement "in a number of ways," including by "[s]ending the enrollee a single monthly invoice or bill that separately itemizes the premium amount for non-excepted abortion services; sending a separate monthly bill for these services; or sending the enrollee a notice at or soon after the time of enrollment that the monthly invoice or bill will include a separate charge for such services and specify the charge." *Id.*; *see also id.* at 10,841 (affirming guidance in the proposed rule to the same effect).

40.     HHS interpreted Section 1303's requirement that issuers collect from enrollees a "separate payment" for non-Hyde abortion care to permit the consumer to "pay the premium payment for non-excepted abortion services and the separate payment for all other services in a single transaction," so long as the issuer deposited "the two separate payments into the issuer's two separate allocation accounts." *Id.* at 10,840.

41.     HHS explained that providing these options to issuers and consumers would "minimiz[e] burden," while serving Section 1303's purpose of ensuring that federal funds are not used to provide non-Hyde abortion services. *Id.* at 10,841.

42.     In its 2015 rule, HHS expressly rejected the view that Section 1303 requires an issuer "to separately identify the premium for non-excepted abortion services on the monthly premium bill." *Id.* at 10,840.

## III.    The Challenged Rule

43.     In November 2018, just one month after HHS publicly touted its efforts to "remove regulatory obstacles" that "drive up the cost of healthcare" and to ensure "lower cost, higher quality healthcare that puts patients, not Washington, in the driver's seat,"[4] it announced a proposed rule

---

[4] HHS, *Secretary Azar Highlights Recognition of HHS as a Top Agency for Regulatory Reform*, Oct. 17, 2018, https://www.hhs.gov/about/news/2018/10/17/secretary-azar-highlights-recognition-of-hhs-as-top-agency-for-regulatory-reform.html.

to eliminate the flexibility that issuers and consumers had to comply with Section 1303. *See* HHS, Patient Protection and Affordable Care Act; Exchange Program Integrity (hereinafter the "Proposed Rule"), 83 Fed. Reg. 56,015 (Nov. 9, 2018) (to be codified at 45 C.F.R. pts. 155–56).

44.     Under the Proposed Rule, issuers would be required to send enrollees whose plans included non-Hyde abortion coverage two separate bills—one for the abortion-related portion of the premium, and one for the remainder of the premium—in two separate pieces of correspondence. This means issuers would have to send two paper statements in separate envelopes, or two electronic statements in separate emails or notices to enrollees. The Proposed Rule also contemplated that enrollees would have to make two transactions, sending two checks or money orders back each month or making two online or phone transactions.

45.     HHS acknowledged that the language of Section 1303 did not require separate bills and consumer transactions but stated that its proposal would "better align" the regulations with the statute's intent. *Id.* at 56,022.

46.     HHS received more than 74,000 public comments on the Proposed Rule. Most commenters opposed the proposal and asked that it be withdrawn, while a "minority of commenters summarily supported the policy." 84 Fed. Reg. at 71,684. Planned Parenthood Federation of America submitted comments on behalf of its affiliates, including PPM. In addition, members of the insurance industry opposed the regulation, as well as the Attorneys General of numerous states, who submitted comments on behalf of their residents, many of whom purchase insurance on the ACA health insurance exchanges.

47.     The insurance industry and affected states explained that the Proposed Rule would wreak havoc on the exchanges and induce insurers to drop abortion coverage in states where that remained an option, raise consumer premiums, or leave the exchanges altogether. *Id.* at 71,687.

They explained, for example, that the Final Rule would require changes to nearly every aspect of billing and enrollment practices. Insurer representatives also provided detailed descriptions of the Proposed Rule's costs, showing that HHS had massively underestimated the number of affected consumers and the rule's impact, particularly if HHS required implementation in the middle of a plan year. *Id.* at 71,689. Insurers explained why the industry needed a minimum of twelve to eighteen months—or even longer—to implement any rule, including time to test new systems before expecting consumers to interact with them. One insurance representative also commissioned a survey of consumers who purchased their own health insurance, reporting that 89 percent said that paying two bills every month would be a burden, and 88 percent said that a premium increase would affect their ability to afford healthcare and other necessary expenses.

48.    Other advocates explained that the Proposed Rule would lead to widespread consumer confusion and inadvertent failure to pay the abortion-related premium. It is standard in the insurance industry for individuals to receive a single bill for their premium. Consumers who receive two separate bills may inaccurately believe that the separate bill is a scam, an error by the issuer, or a charge for coverage that they did not request. Under current regulations, a consumer's failure to pay premiums typically results in the loss of coverage after a grace period is exhausted, and full payment of the premium for the first month of enrollment is necessary to obtain insurance coverage. Because of the risk of consumer confusion and inadvertent non-payment, advocates warned that many individuals would have their entire plans terminated for non-payment, or never be able to obtain coverage in the first place. *See id*. at 71,684. They described how the Proposed Rule's harms would fall most heavily on consumers who already struggle to navigate the healthcare system, including people with disabilities and limited English proficiency. They also explained that consumers who were unable to obtain or maintain coverage because of the rule

would generally need to wait until the following plan year's enrollment period to try to enroll again.

49.     Patient advocates described the harms to individuals who would lose abortion coverage that they later needed, such as high out-of-pocket costs, delays in abortion care, and potentially insurmountable financial barriers to accessing care. *See id.* at 71,688; *see also, e.g.*, Comment of Planned Parenthood Federation of America (Jan. 8, 2019), CMS-2018-0135-73625. As they explained, the loss of coverage would threaten the health, well-being, and economic security of these patients nationwide. 84 Fed. Reg. at 71,688.

50.     Despite this public outcry, in December 2019, HHS issued the Final Rule, with only small modifications. HHS decided not to require issuers to make "separate mailings with separate postage, as proposed," *id.* at 71,685, but it still mandated that issuers send each policy holder separate monthly bills for each of the amounts attributable to the abortion-related coverage and all other coverage, "either by sending separate paper bills which may be in the same envelope or mailing, or by sending separate bills electronically, which must be in separate emails or electronic communications." *Id.* at 71,710–11, to be codified at § 156.280(e)(2). It estimated this requirement would result in issuers and States sending "1.82 million separate paper bills [to consumers] per month." *Id.* at 71,699.

51.     The Final Rule also directed issuers to "[i]nstruct the policy holder to pay each of the [bill] amounts . . . through separate transactions." *Id.* at 71,710–11, to be codified at § 156.280(e)(2). However, if a policy holder disregards that instruction, the issuer cannot refuse the payment or terminate the policy holder's coverage, *id.*, which HHS recognized would be "an unreasonable result of an enrollee paying in full, but failing to adhere to the [plan] issuer's requested payment procedure." *Id.* at 71,685.

52.     HHS stated that under these circumstances, the issuer may "treat the portion of the premium attributable to coverage of non-Hyde abortion services as a separate payment," as the existing regulations *already* permit the issuer to do, and the issuer would then "disaggregate the amounts in [its] separate allocation accounts." *Id.*

53.     HHS again recognized that these measures were not necessary to comply with Section 1303's mandate, which "do[es] not specify the method a [plan] issuer must use to comply." *Id.* at 71,683; *see also id.* at 71,694 (stating that the Final Rule "does not wholly depart from the previous interpretation, it merely refines it to better reflect the statute"). Although HHS based its reinterpretation of Section 1303 on that provision's language regarding an issuer's responsibility to collect "separate payments" from enrollees, HHS conceded that the flexible "methods of itemizing or providing advance notice about the amounts" due for each portion of a consumer's premium—compliance options permitted under the previous rules—"arguably identifie[d] two 'separate' amounts for two separate purposes," consistent with the statutory text. *Id.* at 71,693.

54.     Despite wrapping the Final Rule in the guise of program "integrity," HHS conceded that there was no evidence of issuers failing to comply with Section 1303's separate-accounting requirement. *Id.* at 71,692.

55.     HHS also acknowledged that the Final Rule would be far more burdensome than it had anticipated in the Proposed Rule, even with the Final Rule's minor modification permitting issuers to send separate bills in a single envelope. As one example, HHS estimated that issuers would spend more than 2.96 *million* hours making one-time changes to their technological systems, billing-related outreach, and call-center training in the first year, *id.* at 71,697, up from the Proposed Rule's estimate of 750 hours total nationwide, 83 Fed. Reg. at 56,025. In other words, the actual time needed to implement just a portion of the Final Rule in 2020 is nearly *4,000* times

greater than HHS predicted when it proposed the rule, yet it adopted the Proposed Rule with only minor modifications.

56.     HHS further acknowledged that in the 2020 plan year alone, the Separate-Billing Rule would affect approximately 3 million enrollees, 84 Fed. Reg. at 71,706, roughly one-third of individual-market insurance plans on exchanges, and twenty-one states, *id.* at 71,696.

57.     Based on this analysis, and without quantifying numerous costs that the Final Rule acknowledged, HHS concluded that the Final Rule would cost more than $1.26 billion between 2020 and 2024. *Id.* at 71,707. HHS also estimated that the cost to consumers alone would exceed $135 million between 2020 and 2024, based only on the additional time that each policy holder would spend reading and understanding separate bills. *Id.* at 71,706–07. In a departure from the Proposed Rule, HHS did not quantify consumers' time spent making two separate transactions every month to pay their insurance premium, nor did it explain its decision to ignore these costs.

58.     HHS agreed that the Separate-Billing Rule would have many of the negative effects on coverage and access that commenters feared. HHS conceded, for example, that "even with fulsome outreach and education efforts to explain the billing scheme to the policy holder, consumer confusion could still lead to inadvertent coverage losses." *Id.* at 71,686. To "fix" this problem created by the rule, HHS suggested that it might propose further rulemaking to change its regulations governing termination for non-payment of premiums, but it identified no timetable for that action and warned that its statements should not "be construed as a representation or guarantee" that HHS would, in fact, ever address the problem of consumers losing healthcare coverage. *Id.* at 71,686 n.12. HHS thus left plan enrollees, the most vulnerable parties affected by the Final Rule, to decipher the separate bills for themselves, while acknowledging that the resultant confusion will cause some of them to inadvertently lose coverage.

59.     HHS also stated that it would not take enforcement action against an issuer that adopted a policy of not placing an enrollee into a grace period and not terminating coverage "based solely on the policy holder's failure to pay the portion of the premium attributable to non-Hyde abortion services." *Id.* at 71,686. However, it did not require issuers to adopt such a policy, and it made clear that issuers "would still be required to collect the premium for the non-Hyde abortion coverage." *Id*. Thus, enrollees who inadvertently fail to pay the premium for non-Hyde abortion care would still accrue a debt to the issuer each month they fall short. *Id.*

60.     Despite estimating that the Final Rule would cost well over $1.26 billion by the end of 2024, HHS did not identify a *single* quantifiable benefit from it.

61.     Instead, while acknowledging that Section 1303's language does not dictate what the Final Rule requires, HHS asserted that the "primary" benefit was "better align[ment]" of the regulations "with the intent of section 1303." *Id.* at 71,685; *see also, e.g.*, *id.* at 71,688; *id.* at 70,671. HHS also asserted that the Final Rule might "increase transparency for policy holders who object on the basis of conscience to coverage of non-Hyde abortion services" in their plans. *Id.* at 71,691; *see also id.* at 71,707 (asserting benefits to policy holders who "seek a better understanding of what their health care dollars are purchasing"). HHS did not explain how this asserted benefit was consistent with portions of Section 1303 that already govern notice to consumers regarding abortion coverage and its cost. Nor did it address why the Final Rule's requirements doubling the number of necessary bills and consumer transactions—month after month, year after year—were necessary to achieve this notice objective given that the existing regulations, which track the language of Section 1303, already require notice to consumers of non-Hyde abortion coverage.

62.     HHS also rejected commenters' pleas not to require implementation of the Separate-Billing Rule during a plan year. It announced that the Rule would take effect on February

25, 2020, and that issuers would have only six months from the publication date—or until June 27, 2020—to begin sending separate monthly bills and telling consumers to make payments in separate transactions. *Id.* at 71,686–87. It provided no explanation for its conclusion that six months was sufficient time, contending only that expedited implementation would provide the expected "benefits" of the rule more quickly. Indeed, in its analysis of regulatory alternatives to the Final Rule, HHS indicated that it considered only a three-month implementation period as a viable alternative. *Id.* at 71,708.

63.     Finally, in the preamble to the Final Rule, HHS announced a new "enforcement polic[y]," *id.* at 71,687, on which it had not sought public comment and which was not foreshadowed by the Proposed Rule. Under this policy, HHS bound itself not to take enforcement action against issuers "that modify the benefits of a plan either at the time of enrollment or during a plan year to effectively allow enrollees to opt out of coverage of non-Hyde abortion services" (the "Opt-Out Policy"). *Id.* at 71,686.

64.     An opt-out will apply not just to the policy holder, but also to anyone else, such as a spouse or adult child, reliant on that same policy, and it cannot be retracted for the remainder of the plan year. *Id*.

65.     Under the Opt-Out Policy, HHS provided that individuals who opt out will no longer have an obligation to pay the premium for non-Hyde abortion care, and they cannot use the abortion coverage included in the plan. *Id.* Unlike its burdensome requirement that consumers make two transactions each month for a plan including abortion coverage, HHS encouraged issuers to make *opting out* of abortion coverage seamless by "includ[ing] on the separate bill for coverage of non-Hyde abortion services or separate electronic communication an option (such as a check

box or option button) where the policy holder can affirmatively indicate their intent to opt-out of such coverage by not paying the separate bill." *Id.* at 71,687.

66.     HHS suggested that issuers could rely on the Opt-Out Policy to minimize the "number of enrollee terminations as a result of delinquent premium payments," *id.* at 71,706, a problem of the Separate-Billing Rule's own creation.

## IV.     The Impact of the Final Rule on Plaintiffs

67.     Implementation of the Final Rule would be devastating to Plaintiffs and impose costs on them that cannot be recovered from the United States after judgment.

68.     Through its health centers, PPM provides comprehensive reproductive health care services to patients who participate in a Medicaid program, are covered by private insurance, or are uninsured. Most of its patients reside in Maryland, which permits but does not require insurance plans offered on its exchange to cover non-Hyde abortion care.

69.     In 2019, PPM served more than 27,900 patients at more than 44,800 patient visits. PPM performed 6,897 abortions in 2019. Approximately eighteen percent of PPM's abortion patients relied on commercial insurance to pay for abortion services.

70.     When patients do not have insurance coverage or have insurance without abortion coverage, PPM does its best to defray the remaining costs for patients with the greatest need, but sometimes it is unable to do that. PPM already has a large number of patients with a need for financial assistance. In 2019, more than one-third of PPM's abortion patients had no insurance coverage for their care and therefore were forced to pay out-of-pocket for these services.

71.     All individual-market plans on Maryland's ACA exchange cover non-Hyde abortion care.

72.     PPM provides health care services, including abortions, to patients who rely on reimbursements from Maryland exchange plans.

73.     If the Final Rule is implemented, as Defendants have acknowledged, issuers will likely drop non-Hyde abortion coverage from their plans on the individual exchanges to avoid the substantial costs of compliance. Some PPM patients who rely on those plans will be unable to afford the cost of an abortion, on top of their other expenses, or will be delayed in accessing care beyond the point in pregnancy at which abortion services are available. Accordingly, some individuals may be prevented from accessing abortion care altogether, with long-lasting, negative effects on their health, well-being, and economic futures.

74.     Delays in accessing care may prevent other patients from obtaining the abortion method they determine is best for them. Moreover, although abortion is a very safe medical procedure, like all medical procedures, it has risks. Those risks increase with gestational age at the time of abortion, as do the costs of the procedure.

75.     In addition, where patients lose coverage because of the Final Rule, PPM will no longer be able to seek reimbursements from patients' private insurance plans to cover services. The coverage loss will likely result in an influx of additional patients seeking reduced-fee abortion services that will further strain PPM's limited resources to help patients in need. The Final Rule will also impede efforts by PPM to improve the reproductive health of individuals in Maryland. Rather than using its resources to move forward to improve the health and lives of patients, it will need to divert resources to pay for abortion coverage dropped by exchange plans.

76.     In addition, even where exchange plans nominally maintain abortion coverage, some PPM patients will lose access to this coverage because of the Final Rule's Opt-Out Policy. Some of these patients are not the policy holders of their insurance plans, but are instead covered under the plans of a parent, spouse, or partner. These patients could, therefore, lose access to abortion coverage without ever agreeing to it or even being informed of it. Other patients may be

confused about the effect of an "opt-out," erroneously believing that they can forgo paying the abortion-related premium under an opt-out while still maintaining abortion coverage. Other patients—already under financial strain—may deal with rising premiums or other financial stressors by opting out of abortion coverage on the assumption they will not need it, only to find themselves with an unintended pregnancy and seeking an abortion from PPM in the future.

77. The Final Rule also threatens PPM's patients with the loss of health care coverage altogether due to non-payment of the abortion premium. As with the loss of abortion coverage, a patient's loss of all insurance coverage could prevent them from obtaining services at PPM, including birth control, testing for STIs, and breast and cervical cancer screening. It could also result in greater demands on the limited financial resources that PPM has available to help defray the costs of these services.

78. The Final Rule will also impose burdensome costs on Plaintiffs Hambrick, Barson, DiDato, and Hollander (hereinafter, the "Consumer Plaintiffs") and expose them to serious health and economic consequences. First, once the Final Rule is effective, Consumer Plaintiffs will have to read and review two separate bills for their exchange plan coverage every month and attempt to follow the instructions of their carriers to pay those bills through two separate transactions.

79. Because of inconsistent income, Plaintiff DiDato pays her health insurance premiums manually each month to ensure that sufficient funds are available in her accounts to cover costs. The Final Rule will require that she spend time each month making two payments through separate online transactions. All other Plaintiffs will have to expend time at least once per year setting up automatic payments for two transactions instead of one.

80. In addition, as HHS recognized, the Final Rule will lead to increases in the Consumer Plaintiffs' premiums and expose them to loss of insurance coverage for inadvertent non-

payment. Any lapse in coverage could have devastating consequences for the Consumer Plaintiffs' health and expose them to high out-of-pocket costs, particularly for Plaintiffs Barson and Hambrick, each of whom has existing medical conditions that require consistent access to healthcare. Moreover, Plaintiffs Barson and DiDato are required by D.C. and New Jersey law, respectively, to maintain health insurance coverage and could be subject to tax penalties for failure to comply.

81.     The Final Rule also exposes Plaintiffs Barson, Hambrick, and DiDato to the loss of abortion coverage in their preferred insurance plans because their states of residence do not require issuers to extend such coverage. Where these plaintiffs lose abortion coverage, they will be required to seek any needed abortion care without insurance coverage to reimburse its costs, while navigating many other existing barriers to abortion access aside from cost.

## FIRST CAUSE OF ACTION
### (Violation of the APA – Contrary to Law and in Excess of Statutory Authority)

82.     The allegations in paragraphs 1 through 81 are incorporated as if fully set forth herein.

83.     An agency rule or action that is contrary to law or in excess of statutory authority is not valid. 5 U.S.C. § 706(2). The Final Rule is contrary to Sections 1554 and 1303 of the ACA, including as follows:

*Section 1554 of the ACA*

84.     Section 1554 of the ACA provides that, notwithstanding any other provision of the statute, HHS may not adopt any regulation that "creates any unreasonable barriers to the ability of individuals to obtain appropriate medical care," "impedes timely access to health care services," or "limits the availability of health care treatment for the full duration of a patient's medical needs."

42 U.S.C. § 18114; *see also id.* § 300gg-91(a)(2) (defining "medical care" to include insurance coverage for care).

85.     The whole purpose of the Final Rule is to erect barriers to abortion coverage and to impede as many patients from seeking timely abortion care as possible, and if it is permitted to be implemented, it will have that effect. Although HHS suggested that the Final Rule is consistent with Section 1554 because issuers in states permitting but not requiring abortion coverage would nominally maintain "discretion" to keep or drop the coverage, 84 Fed. Reg. at 71,694, that consideration is irrelevant to Section 1554's application. Moreover, as HHS concedes, Section 1303 does not require separate bills and consumer transactions, has no quantifiable benefit to any member of the public, and will cost more than $1.26 billion, all while causing some consumers to lose their insurance coverage and raising premiums for vulnerable families. Accordingly, it is an "unreasonable" barrier to care under Section 1554. For these reasons and others, the Final Rule exceeds HHS's statutory authority under Section 1554 and is contrary to this portion of the statute.

***Section 1303's Collection Requirements***

86.     Section 1302(b)(2)(B)(i) mandates that issuers offering plans that include non-Hyde abortion care "shall . . . collect from each enrollee" the portion of the plan premium attributable to abortion care and the remainder of the premium. 42 U.S.C. § 18023(b)(2)(B)(i).

87.     The Final Rule's Opt-Out Policy flouts this requirement by allowing issuers to permit consumers who have purchased a plan with non-Hyde abortion coverage to stop paying for that portion of coverage (after creating a ready pool of consumers who may seek to opt out to avoid the administrative burdens of the rule and the increased premium costs it creates). Because the result of the Final Rule will be that some issuers do not, in fact, "collect from each enrollee" the

non-Hyde abortion portion of their coverage, it conflicts with Section 1303(b)(2)(B)(i) and is contrary to law under the APA.

***Section 1303's Notice Requirements***

88.     Section 1303(b)(3) limits the extent to which HHS may require that issuers make additional disclosures with respect to abortion coverage in the insurance exchanges, and the Final Rule openly disregards that provision. Specifically, Section 1303(b)(3)(A) provides that at the time of enrollment, issuers must provide a notice to enrollees of non-Hyde abortion coverage, but "*only as part of the summary of benefits and coverage explanation.*" 42 U.S.C. § 18023(b)(3)(A) (emphasis added). And that notice, along with "any other information [for enrollees] specified by" HHS, "shall provide information *only* with respect to the total amount of the combined payments for [non-Hyde abortion services] and other services covered by the plan." *Id.* § 18023(b)(3)(B) (emphasis added).

89.     Accordingly, Section 1303(b)(3) does not foreclose an issuer after the time of enrollment from voluntarily providing disaggregated billing information to enrollees regarding the specific costs of abortion coverage. However, it forbids HHS from mandating such disclosures, either at the time of enrollment when consumers make initial payments to secure coverage or through subsequent billing correspondence. As HHS acknowledges, however, the Separate-Billing Rule is intended to serve in part as a consumer disclosure. *See, e.g.*, 84 Fed. Reg. at 71,695 (stating that consumers could use the bills "to decide whether to remain enrolled in" a plan covering abortion "or seek a [plan] without such coverage"). Because this provision contravenes Section 1303, it is beyond HHS's authority under Section 1303(b)(3) and contrary to law under the APA.

## SECOND CAUSE OF ACTION
### (Violation of the APA – Arbitrary and Capricious)

90.     The allegations in paragraphs 1 through 81 are incorporated as if fully set forth herein.

91.     An agency rule that is arbitrary or capricious is invalid. 5 U.S.C. § 706(2)(A). Agency action is considered arbitrary and capricious if, among other reasons, "the agency has relied on factors which Congress has not intended it to consider" or "entirely failed to consider an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

92.     HHS cannot point to *any* evidence that the previous rules were unworkable or resulted in even limited non-compliance by issuers in appropriately segregating premiums for abortion-related coverage and coverage for all other services. The Final Rule thus offers a $1.26 billion "solution" in search of a problem. The Final Rule also disregards or otherwise fails to meaningfully consider and address material facts and evidence submitted during the comment period. *See, e.g.*, *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009) ("[A] reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy.").

93.     Defendants' justifications for the Final Rule are arbitrary and capricious, including in the following ways.

### *Inadequate Cost Analysis That Ignores Available Data*

94.     HHS dramatically underestimates the Final Rule's costs in its already-high estimate. For example, HHS quantified costs to consumers based only on their time spent reading and reviewing two separate bills each month. 84 Fed. Reg. at 71,706; *see also* CMS, Supporting Statement for Billing and Collection of the Separate Payment for Certain Abortion Services (same

in a CMS statement to the Office of Management and Budget to justify the Final Rule's information-collection requirements).[5] HHS did not use those same methods to quantify the costs to consumers for estimated time spent actually *paying* those bills in separate transactions, per the issuers' instructions. There is no question that HHS should have quantified those costs, since it provided an (unreasonably low) estimate for them in the Proposed Rule. *See* Proposed Rule, 83 Fed. Reg. at 56,028–29. HHS does not explain why it jettisoned these costs in the Final Rule.

95.    HHS also did not calculate costs to consumers of "additional postage, money order fees, credit card fees, or other banking fees for the second bill." 84 Fed. Reg. at 71,706. Even if HHS could not calculate those costs with precision, it failed even to estimate a lower bound for them, despite acknowledging that *ninety percent* of individual-market exchange enrollees receive paper bills and many of those consumers would not have the ability to set up auto-pay options, which come with their own related costs. *Id*. at 71,699.

96.    HHS also made no attempt to quantify increased premium costs to consumers, or the impact of these costs and inadvertent terminations on plan enrollment. Yet HHS acknowledged that the Final Rule would result in "an approximate premium impact of up to 1.0 percent" annually. *Id.* at 71,704.

97.    In addition, HHS did not attempt to quantify the out-of-pocket health care and other costs to patients who lose abortion coverage, or those costs that accrue where a consumer's insurance plan lapses due to inadvertent non-payment. *See id.* at 71,700–01 (Table 7).

98.    Even under HHS's flawed cost analysis, it recognized that the Final Rule would impose more than $1.26 billion in burden on consumers, issuers, states, and the federal

---

[5] *Available at* https://www.cms.gov/Regulations-and-Guidance/Legislation/Paperwork ReductionActof1995/PRA-Listing-Items/CMS-10681.

government. In the face of that burden, it could not identify a *single* quantifiable benefit of the rule and acknowledged that the rule was not required by statute. Imposing such massive costs for no discernible benefit is arbitrary and capricious under the APA.

***Reliance on Irrational and Illegitimate "Benefits" at Odds with Section 1303***

99.     HHS's assertions that the Final Rule was necessary to provide two unquantifiable benefits to the public were fundamentally illogical and inconsistent with the ACA. First, HHS asserted that the Rule would "better align" the regulations "with the intent of section 1303," *id.* at 71,685; *see also, e.g.*, *id.* at 71,688; *id.* at 70,671, but Section 1303 makes clear why that is not so. Section 1303 was intended to preserve the status quo at the time of the ACA's adoption, which prohibited the use of federal funds to cover non-Hyde abortion care without imposing federal restrictions on the ability of issuers to offer abortion coverage paid for by private or state dollars. The Final Rule's requirement that issuers send separate bills and that consumers pay those bills in separate transactions every month does nothing to further the statute's focus on prohibiting the *use* of federal dollars for abortion care. In addition, even assuming that HHS's interpretation of the requirement that enrollees make "separate payments" were required, it does not justify HHS's additional conclusion that separate *bills* are required to ensure those payments. Moreover, in adopting the ACA, Congress intended to make health insurance more affordable, accessible, and expansive. *See, e.g.*, 42 U.S.C. §§ 300gg-18, 18114. HHS concedes that the Final Rule will do the opposite.

100.     Second, HHS asserts that the Final Rule will help inform consumers opposed to abortion that their plans cover such care and will identify for those consumers what portion of their private dollars are helping pay for it. *See, e.g.*, 84 Fed. Reg. at 71,694. It is completely irrational to further that interest (even assuming it were legitimate) by imposing more than $1.26 billion in

costs and requiring issuers to send separate bills to consumers, month after month, for two portions of the same premium and to instruct consumers to pay those bills in separate transactions. It is likewise irrational to impose such costs for the purported benefit of a minority of consumers who already receive fair notice of coverage terms, at the expense of the vast majority of enrollees satisfied with their coverage and the many patients who will lose coverage entirely or find themselves without abortion coverage they desperately need.

101.    Moreover, HHS has portrayed the Separate-Billing Rule as implementing language in Section 1303's separate-accounting requirement, 42 U.S.C. § 18023(b)(2), not its notice provisions, *id.* § 18023(b)(3). The separate-accounting requirement concerns a prohibition on the use of *federal funds* for non-Hyde abortion care. It does not remotely address what HHS sees as the rule's benefit of notifying consumers who "object to purchasing" plans that "include coverage of non-Hyde abortion services" paid for by *private funds*, as that coverage must be under Section 1303. 84 Fed. Reg. at 71,686; *see also, e.g.*, *id.* at 71,707 (asserting benefits to policy holders who "seek a better understanding of what *their* health care dollars are purchasing" (emphasis added)).

***Arbitrary Implementation Date***

102.    HHS's selection of the June 2020 implementation date is also arbitrary and capricious. HHS acknowledged that requiring implementation mid-plan year would mean that insurers could not raise premiums or remove coverage of non-Hyde abortion services until the following plan year, so they would have to bear the costs of the Final Rule in the interim. It also estimated that its six-month implementation mandate would require issuers to pay a fifty percent premium in contract and overtime costs in the first year of the rule. *Id.* at 71,689; *id.* at 71,697.

103.    HHS's only justification for the chosen implementation date was that it would "appropriately prioritize[] the goals of improved statutory alignment," *id.* at 71,689, and was

necessary to address some "commenters' concerns regarding the lack of transparency as to whether their [plan] covers non-Hyde abortion services, transparency that would [otherwise] be delayed," *id.* at 71,690. These flawed benefit assertions are even more irrational in this context than they are with respect to the remainder of the Final Rule, given the far greater expenses associated with implementation mid-plan year.

***Opt-Out Policy***

104.    In its discussion of the Opt-Out Policy, HHS did not acknowledge that Section 1303 expressly requires issuers offering non-Hyde abortion coverage in their plans to "collect from each enrollee" the cost of that coverage, 42 U.S.C. § 18023(b)(2)(B), in addition to the cost of all remaining coverage under the plan. *See generally* 84 Fed. Reg. at 71,686–88. Accordingly, it did not even attempt to explain how its Opt-Out Policy would be consistent with that mandate.

105.    Nor did HHS acknowledge the financial impact of the Opt-Out Policy on plans if a significant number of enrollees opt out to avoid the Separate-Billing Rule's burdens. Issuers must calculate the premium portion for non-Hyde abortion care based on the total enrollee population, without respect to age, sex, or family status. 42 U.S.C. § 18023(b)(2)(B). Accordingly, plans and remaining enrollees will shoulder the costs of the Opt-Out Policy alone. In addition, as HHS itself suggested, plans may turn to this Opt-Out Policy as a way to deal with the many enrollees who will fail to pay the abortion-related premium out of confusion and otherwise face termination of coverage. HHS's failure to consider these financial impacts, along with the fact that it ignored entirely a portion of Section 1303 at odds with the Opt-Out Policy, was arbitrary and capricious and therefore invalid under the APA.

### THIRD CAUSE OF ACTION
### (Violation of the APA – Failure to Observe Procedure Required by Law)

106.     The allegations in paragraphs 1 through 81 are incorporated as if fully set forth herein.

107.     The Final Rule is a substantive and legislative rule that was subject to the APA's requirement that HHS provide the public with notice of the rule and an opportunity to comment on it. 5 U.S.C. § 553.

108.     The Opt-Out Policy, however, is not a "logical outgrowth" of the Proposed Final Rule. *Am. Paper Inst. v. U.S. EPA*, 660 F.2d 954, 960 n.13 (4th Cir. 1981). Indeed, it far exceeds the scope of what HHS indicated it was considering in the Proposed Rule, and interested parties could not reasonably have foreseen that HHS was going to expand the scope of the rule in this way.

109.     Had interested parties known that HHS was considering this option, they would have made clear to HHS that the Opt-Out Policy is at odds with Section 1303's plain language, which requires a plan that covers abortion care to "collect from each enrollee" the portion of the premium attributable to non-Hyde abortion care. They also would have explained that the Opt-Out Policy is fundamentally irrational and inconsistent with the purpose of Section 1303.

110.     Accordingly, the Final Rule should be held unlawful based on HHS's failure to observe procedures required by law and set aside under 5 U.S.C. §§ 553 and 706(2)(D).

### PRAYER FOR RELIEF

111.     WHEREFORE, Plaintiffs pray that this Court:

(A)  Declare that Defendants have violated the APA by adopting the Final Rule using a rationale that is arbitrary, capricious, and otherwise contrary to law, and by failing to notify the public and afford it an opportunity to comment before adopting the Final Rule;

(B)  Declare unlawful and immediately vacate the Final Rule;

(C)  Issue permanent, and if necessary preliminary, injunctive relief without bond that prevents the Defendants from requiring implementation of the Final Rule;

(D)  Award Plaintiffs their costs and expenses, including reasonable attorneys' fees; and

(E)  Grant such other relief as this Court deems just and proper.

Respectfully submitted,

Andrew D. Freeman, Bar No. 03867
Monica R. Basche, Bar No. 20476
Brown, Goldstein & Levy, LLP
120 E. Baltimore Street, Suite 1700
Baltimore, MD  21202
Phone: (410) 962-1030
Fax: (410) 385-0869
adf@browngold.com
mbasche@browngold.com

*Attorneys for Plaintiffs*

Julie A. Murray*
Carrie Y. Flaxman*
Planned Parenthood Federation of America
1110 Vermont Avenue, NW, Suite 300
Washington, DC 20005
Phone: (202) 803-4045
julie.murray@ppfa.org
carrie.flaxman@ppfa.org

*Attorneys for Plaintiff Planned Parenthood of Maryland, Inc.*

Andrew Beck*
Meagan Burrows*
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Phone: (212) 549-2633
Fax: (212) 549-2652
abeck@aclu.org
mburrows@aclu.org

*Attorneys for Plaintiffs Kirsty Hambrick, Rebecca Barson, Mariel DiDato and Tanja Hollander*

\*  *Motion for admission pro hac vice to be filed*

Dated: February 11, 2020