# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

PLANNED PARENTHOOD OF
MARYLAND, INC., *et al.*,

           *Plaintiffs*,

    v.

ALEX M. AZAR II, Secretary of the United
States Department of Health and Human
Services, in his official capacity, *et al.*,

           *Defendants*.

Case No. CCB-20-00361

# MEMORANDUM IN SUPPORT OF
## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

TABLE OF AUTHORITIES ........................................................................................ iii

INTRODUCTION AND SUMMARY OF ARGUMENT .......................................... 1

STATEMENT OF UNDISPUTED FACTS ............................................................. 4

I.      Section 1303 of the ACA ............................................................................ 4

II.     Initial Regulations and Guidance Implementing Section 1303 ..................... 8

III.    Adoption of the Separate-Billing Rule ......................................................... 9

        A.      Proposed Rule ................................................................................... 9

        B.      Final Rule ........................................................................................ 14

IV.     This Litigation and The Rule's Impact on Plaintiffs ................................... 18

STANDARD OF REVIEW ................................................................................... 20

ARGUMENT ........................................................................................................ 21

I.      The Separate-Billing Rule Is Arbitrary and Capricious. .............................. 21

        A.      HHS's Justifications for The Rule Are Illogical and Rest on Nonexistent
                Benefits. .......................................................................................... 21

        B.      The Separate-Billing Rule's Imposition of Massive Costs for No
                Discernible Benefit Is Irrational. ..................................................... 25

        C.      HHS Ignored Significant Costs of The Final Rule to The Most Vulnerable
                Parties Affected. .............................................................................. 26

        D.      HHS Adopted an Arbitrary Implementation Deadline. ..................... 29

        E.      HHS Failed to Consider The Impact of The Opt-Out Policy on Issuers and
                Enrollees Who Seek to Maintain Abortion Coverage. ....................... 31

II.     The Separate-Billing Rule Is Contrary to Section 1554 of the ACA. ........... 32

III.    The Separate-Billing Rule Is Contrary to The ACA's Mandate That All Enrollees
        Purchasing Exchange Plans with Abortion Coverage Pay for That Coverage. ................ 34

IV.     The Separate-Billing Rule Conflicts with Section 1303's Provisions Regarding
        Consumer Notice of Abortion Coverage. ..................................................... 35

V.      HHS Adopted The Separate-Billing Rule's Opt-Out Policy Without Notice and an Opportunity for Public Comment. ................................................................................... 37

CONCLUSION .......................................................................................................................... 38

# TABLE OF AUTHORITIES

**Cases**                                                                                          ***Page(s)***

*Am. Paper Inst. v. U.S. EPA,*
    660 F.2d 954 (4th Cir. 1981) ........................................................................ 37

*ANR Storage Co. v. Fed. Energy Regulatory Comm'n,*
    904 F.3d 1020 (D.C. Cir. 2018) .................................................................... 37

*Bus. Roundtable v. S.E.C.,*
    647 F.3d 1144 (D.C. Cir. 2011) .................................................................... 27

*California v. HHS,*
    No. 4:20-cv-00682 (N.D. Cal. filed Jan. 30, 2020) ....................................... 20

*Casa De Maryland v. U.S. Dep't of Homeland Sec.,*
    924 F.3d 684 (4th Cir. 2019) ........................................................................ 37

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986) ...................................................................................... 20

*Chen Zhou Chai v. Carroll,*
    48 F.3d 1331 (4th Cir. 1995) ........................................................................ 37

*Dow AgroSciences LLC v. Nat'l Marine Fisheries Serv.,*
    707 F.3d 462 (4th Cir. 2013) ........................................................................ 30

*Encino Motorcars, LLC v. Navarro,*
    136 S. Ct. 2117 (2016) .................................................................................. 21

*Entergy Corp. v. Riverkeeper, Inc.,*
    556 U.S. 208 (2009) ...................................................................................... 26

*Ergon-W. Virginia, Inc. v. EPA,*
    896 F.3d 600 (4th Cir. 2018) ........................................................................ 30

*FCC v. Fox Television Stations,*
    556 U.S. 502 (2009) ...................................................................................... 22

*Jimenez-Cedillo v. Sessions,*
    885 F.3d 292 (4th Cir. 2018) ................................................................. 22, 28

*Lopez v. Davis,*
    531 U.S. 230 (2001) ...................................................................................... 34

*Michigan v. EPA,*
    135 S. Ct. 2699 (2015) .................................................................................. 26

*Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*,
    463 U.S. 29 (1983) ..................................................................... 21, 32

*Nat'l Cable & Telecomm'ns Ass'n v. Brand X Internet Servs.*,
    545 U.S. 967 (2005) ......................................................................... 22

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
    567 U.S. 519 (2012) ..................................................................... 4, 23

*New York v. HHS*,
    414 F. Supp. 3d 475 (S.D.N.Y. Nov. 6, 2019) ................................. 6

*Ohio River Valley Envtl. Coal., Inc. v. Kempthorne*,
    473 F.3d 94 (4th Cir. 2006) ....................................................... 24, 37

*Pub. Citizen v. Fed. Motor Carrier Safety Admin.*,
    374 F.3d 1209 (D.C. Cir. 2004) ..................................................... 27

*Sierra Club v. Dep't of the Interior*,
    899 F.3d 260 (4th Cir. 2018) ................................................ 21, 24, 38

*United States v. F/V Alice Amanda*,
    987 F.2d 1078 (4th Cir. 1993) ....................................................... 30

*Washington v. Azar II*,
    No. 2:20-cv-00047 (E.D. Wash. filed Jan. 31, 2020) ...................... 20

*W. Va. Dep't of Health & Human Res. v. Sebelius*,
    649 F.3d 217 (4th Cir. 2011) ......................................................... 21

**Statutes, Rules, and Regulations**

5 U.S.C. § 551(4) ...................................................................................... 37

5 U.S.C. § 553 ....................................................................................... 4, 37

5 U.S.C. § 706 .................................................................................. *passim*

42 U.S.C. § 300gg .................................................................................... 35

42 U.S.C. § 300gg-91(a)(2) ...................................................................... 32

42 U.S.C. § 18021 ...................................................................................... 4

42 U.S.C. § 18023 ............................................................................ *passim*

42 U.S.C. § 18031 ................................................................................... 4, 5

42 U.S.C. § 18071 ...................................................................................... 5

42 U.S.C. § 18114 ................................................................................................ 32, 34

Fed. R. Civ. P. 56 ................................................................................................... 20

Notice of Benefit and Payment Parameters for 2016,
   80 Fed. Reg. 10,750 (Feb. 27, 2015) ............................................................... 8

Patient Protection and Affordable Care Act; Establishment of Exchanges and
   Qualified Health Plans; Exchange Standards for Employers, 77 Fed. Reg. 18,310
   (Mar. 27, 2012) ............................................................................................... 8

Patient Protection and Affordable Care Act; Exchange Program Integrity,
   Proposed Rule, 83 Fed. Reg. 56,015 (Nov. 9, 2018) ............................................ 9, 15, 27

Patient Protection and Affordable Care Act; Exchange Program Integrity, Final
   Rule, 84 Fed. Reg. 71,674 (Dec. 27, 2019) ............................................. *passim*

Patient Protection and Affordable Care Act; Exchange Program Integrity, Notice of Correction,
   85 Fed. Reg. 2,888 (Jan. 17, 2020) ................................................................... 1

Pub. L. No. 115-245, div. B, tit. V, §§ 506–507 (2019) ............................................... 6

**Other Authorities**

CMS, *2019 OEP State-Level Public Use File* (Nov. 27, 2019), https://www.cms.gov/Research-
   Statistics-Data-and-Systems/Statistics-Trends-and-Reports/Marketplace-Products/
   2019_Open_Enrollment ...................................................................................... 28

CMS, *Bulletin: Timing of Submission of Rate Filing Justifications for the 2019 Filing Year for
   Single Risk Pool Coverage Effective on or after January 1, 2020* (Apr. 4, 2019),
   https://www.cms.gov/CCIIO/Resources/Regulations-and-Guidance/Downloads/final-
   rate-review-timeline-bulletin-April2019.pdf .................................................... 5

CMS, *Supporting Statement for Billing and Collection of the Separate Payment for Certain
   Abortion Services* (Dec. 20, 2019), https://www.cms.gov/Regulations-and-
   Guidance/Legislation/PaperworkReductionActof1995/PRA-Listing-Items/CMS-
   10681 ................................................................................................................ 27

HHS, *Secretary Azar Highlights Recognition of HHS as a Top Agency for Regulatory Reform*
   (Oct. 17, 2018), https://www.hhs.gov/about/news/2018/10/17/secretary-azar-
   highlights-recognition-of-hhs-as-top-agency-for-regulatory-reform.html ...................... 9

Kaiser Family Found., *How State Policies Shape Access to Abortion Coverage* (Feb. 10,
   2020), https://www.kff.org/womens-health-policy/issue-brief/interactive-how-
   state-policies-shape-access-to-abortion-coverage .............................................. 6

SERFF, *State Plan Management Systems and Submission Deadlines for Plan Year 2020* (May 14, 2019), https://serff.com/documents/serff_health_insurance_plan_management_matrix_2020.pdf ................................................................................................................. 5

## INTRODUCTION AND SUMMARY OF ARGUMENT

In December 2019, the U.S. Department of Health and Human Services and Centers for Medicare and Medicaid Services (collectively, "HHS") adopted a rule that they admit will impose more than $1.26 billion in costs on the public and reduce the availability and affordability of health insurance for three million consumers, including more than 156,000 Maryland residents. *See* Patient Protection and Affordable Care Act; Exchange Program Integrity, Final Rule, 84 Fed. Reg. 71,674 (Dec. 27, 2019) (to be codified at 45 C.F.R. pts. 155, 156); Patient Protection and Affordable Care Act; Exchange Program Integrity, Notice of Correction, 85 Fed. Reg. 2,888 (Jan. 17, 2020). If implemented, the rule (hereinafter, the "Separate-Billing Rule" or "Final Rule") will result in long-lasting and potentially catastrophic harm to vulnerable consumers who can least afford to bear the rule's costs. These individuals will pay more in health insurance premiums, lose access to essential healthcare coverage, and be forced to expend valuable time for no benefit to them, all in service of a rule designed to advance an extreme anti-abortion agenda that admittedly achieves no quantifiable benefits.

The Separate-Billing Rule reinterprets Section 1303 of the Patient Protection and Affordable Care Act ("ACA"), 42 U.S.C. § 18023, which establishes special rules for coverage of abortion in insurance plans offered through ACA health benefit exchanges. Under Section 1303, consumers who purchase an individual-market insurance plan on one of the ACA's exchanges may purchase a plan that covers abortion care, if that coverage is permitted or required by the laws of their state and offered by an insurer there. However, the ACA currently bars those consumers from using federal subsidies (also established by the ACA) to pay for abortion coverage except in narrow circumstances. Section 1303, therefore, requires insurers offering exchange plans with abortion coverage (hereinafter, "issuers") to collect "separate payment[s]" from consumers for

their premiums and establish "separate allocation accounts" for the deposit of those payments—one account for the portion of a premium attributable to federally excluded abortion services, and the other for the remainder of the premium (hereinafter, the "separate-accounting requirement"). 42 U.S.C. § 18023(b)(2)(B).

For years, HHS took the position that issuers and consumers could comply with Section 1303's separate-accounting requirement in several ways. Under established HHS rules and guidance, issuers could, for example, provide consumers with a single bill identifying the abortion-related premium portion as a line item, and consumers could pay their entire premium in a single transaction, which issuers would disaggregate and place in separate accounts as required by Section 1303. Issuers could also tell consumers when enrolling that a portion of the premium was for abortion care and could not be funded with federal subsidies, and they could then disaggregate consumers' payments made through a single transaction and place them in separate accounts.

In contrast, beginning on June 27, 2020, the Separate-Billing Rule imposes recurring red tape, requiring issuers that provide abortion coverage in an individual-market exchange plan to send two separate bills to consumers each month—one for the abortion-related portion of their premium and the other for all other coverage. Those issuers must also begin telling consumers to pay their premium in two separate monthly transactions. The Final Rule also adopts a new enforcement policy (hereinafter, the "Opt-Out Policy"), never suggested in the proposed rule, under which HHS will not take enforcement action against issuers that allow consumers to opt out of abortion coverage included in plans they have purchased.

The Separate-Billing Rule violates the Administrative Procedure Act ("APA") and should be vacated for at least three reasons. ***First***, the rule is an arbitrary and capricious exercise of agency discretion that is invalid under the APA. 5 U.S.C. § 706(2)(A). HHS set forth wholly illogical

rationales to support the Final Rule's purported "benefits," and its imposition of more than $1.26 billion in costs on the public, without any discernible, countervailing benefit, is therefore irrational. This conclusion applies with even greater force with respect to the Final Rule's six-month implementation deadline, which only compounds costs while increasing consumer confusion by requiring issuers to comply with the rule in the middle of the plan year. Moreover, HHS ignored critical costs imposed by the rule, most egregiously by omitting quantifiable costs to consumers of paying monthly bills through two transactions instead of one. HHS inexplicably treated these costs as if they are not certain to occur, departing without explanation from the proposed rule's analysis.

*Second*, the Separate-Billing Rule is contrary to three separate provisions of the ACA, and is, therefore, invalid under the APA, 5 U.S.C. § 706(2)(A), (C). Section 1554 of the ACA prohibits HHS from adopting rules that, among other things, create unreasonable barriers to health insurance coverage on the exchanges. In violation of this command, the Separate-Billing Rule is a transparent attempt to reduce consumer participation in plans that offer abortion coverage, and in states where it is permissible, to reduce the number of plans that do so, accomplishing by regulation what Congress refused to do (and prohibited HHS from doing) when it adopted the ACA. Moreover, the Separate-Billing Rule is at odds with a portion of Section 1303 that expressly requires that plans covering abortion "collect from each enrollee" the abortion-related portion of a premium. The Final Rule's Opt-Out Policy would permit some enrollees to forgo paying that portion, leaving remaining plan participants and issuers to shoulder the costs. In addition, the Final Rule, which HHS admits is intended to function as a consumer-disclosure requirement, directly conflicts with a separate subsection of Section 1303 that provides detailed rules regarding what issuers must disclose about abortion-related premiums and coverage. That provision forbids HHS from requiring extra disclosures of the kind mandated by the Final Rule.

**Third**, the Separate-Billing Rule violates the APA's requirement that agencies give notice to the public before adopting substantive rules that change the rights and obligations of regulated parties and the government, and that agencies provide an opportunity for public comment on such rules. *See* 5 U.S.C. §§ 553, 706. The Final Rule's Opt-Out Policy was never mentioned in the proposed rule, nor is it a logical outgrowth of that proposal. HHS's failure to observe the APA's notice-and-comment procedural requirements renders the Final Rule invalid and requires vacatur.

## STATEMENT OF UNDISPUTED FACTS

### I.  Section 1303 of the ACA

Congress adopted the ACA in 2010 "to increase the number of Americans covered by health insurance and decrease the cost of health care." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 538 (2012). To that end, the ACA mandated, among other things, the creation of health insurance exchanges or "marketplaces." 42 U.S.C. § 18031(b), (d). Today, consumers may use these exchanges to compare and directly enroll in public health insurance programs, where eligible, and private health insurance plans offered by issuers participating in an exchange. The ACA's creation of the exchanges helped ensure that individuals could obtain private health insurance even if they lacked access to group coverage, such as insurance provided by an employer, and were ineligible for public insurance programs like Medicaid or Medicare. This case concerns individual-market plans sold on the exchanges, which are designed for and open to individual policyholders and their dependents, as distinguished from exchange plans offered only to small businesses.

Issuers are not required to participate in ACA exchanges. Those that do, however, must offer Qualified Health Plans, meaning that the plans provide certain essential health benefits. *See id.* § 18021. Plans on the ACA exchanges are offered for a "plan year," which runs from January 1 to December 31. Issuers that seek to offer exchange plans generally propose premiums and covered benefits between May and July of the calendar year before the start of a plan year. *See*

SERFF, *State Plan Management Systems and Submission Deadlines for Plan Year 2020* (May 14, 2019), https://serff.com/documents/serff_health_insurance_plan_management_matrix_2020.pdf; CMS, *Bulletin: Timing of Submission of Rate Filing Justifications for the 2019 Filing Year for Single Risk Pool Coverage Effective on or after January 1, 2020* (Apr. 4, 2019), https://www.cms.gov/CCIIO/Resources/Regulations-and-Guidance/Downloads/final-rate-review-timeline-bulletin-April2019.pdf. After issuers finalize premiums and covered services, consumers may purchase exchange plans during an "open enrollment" period, which occurs in the Fall before the applicable plan year. Absent one of the few reasons that justify enrollment mid-year (such as job loss), consumers may not enroll in a plan outside of the open enrollment period set by their respective exchange. *See* 42 U.S.C. § 18031(c).

To help offset the cost of coverage to consumers, the ACA established federal subsidies for income-eligible individuals who purchase insurance through the exchanges. Those subsidies include Advance Premium Tax Credits, which consumers can use to reduce their monthly premiums. These tax credits are only available to households with incomes between 100 and 400 percent of the federal poverty level. *Id.* § 18071.

In Section 1303 of the ACA, 42 U.S.C. § 18023, Congress addressed whether issuers selling individual-market insurance plans on the exchanges could cover abortion services. It expected that many consumers purchasing exchange plans would rely on federal subsidies to pay their premiums, which are funded by appropriations to HHS. At the time of the ACA's passage, federal law prohibited—as it still does today—the use of funds appropriated to HHS (and the Departments of Labor and Education) to pay for abortion care. Although this funding restriction, known as the "Hyde Amendment" for its original House sponsor, is not permanent, it has been attached to recurring federal appropriations legislation for affected agencies since 1976. The Hyde

Amendment, in its current form, contains a limited exception that permits the use of federal funds for abortion services where a pregnancy is the result of rape or incest or threatens the life of the pregnant person. Pub. L. No. 115-245, div. B, tit. V, §§ 506–507 (2019). Federal funding for all other abortion care (hereinafter, "non-Hyde abortion care") is prohibited.

For this reason, patients who rely on federally financed Medicaid, federal employee health insurance, and federal healthcare for service members have generally not been able to turn to these programs to cover abortion services. However, they may still use their private funds or, where available, state funds for this purpose. The Hyde Amendment does not purport to affect what individuals or states can do with their own money. Nor does it apply to private insurance plans, many of which at the time of the ACA's enactment included abortion coverage.

Section 1303 was intended to maintain this status quo on the new exchanges. It was a compromise between legislators who wanted the ACA to further restrict abortion access in the exchanges and legislators who did not want to see the Hyde Amendment expanded and applied to private exchange plans. Section 1303 provides that, unless prohibited by state law, issuers may determine whether to offer abortion coverage in their exchange-based plans. 42 U.S.C. § 18023; *see also New York v. HHS*, 414 F. Supp. 3d 475, 502 (S.D.N.Y. Nov. 6, 2019), *appeal filed*, No. 19-4254 (2d Cir. 2019).[1] However, issuers that offer plans with coverage for non-Hyde abortion care cannot "use any amount attributable" to the ACA's federal subsidies to pay for abortion services where federal funds could not be used for those services. 42 U.S.C. § 18023(b)(1)(B)(i).

---

[1] Twenty-six states prohibit abortion coverage in their health insurance marketplaces, six require it, and eighteen (including Maryland) plus the District of Columbia leave to issuers the decision whether to offer such private coverage. Kaiser Family Found., *How State Policies Shape Access to Abortion Coverage* (Feb. 10, 2020), https://www.kff.org/womens-health-policy/issue-brief/interactive-how-state-policies-shape-access-to-abortion-coverage/.

Section 1303 established the separate-accounting requirement to further implement this prohibition on the use of federal funds for non-Hyde abortion care. Specifically, in a subsection entitled "Prohibition on the use of Federal funds," the statute requires issuers that offer non-Hyde abortion coverage to "collect from each enrollee in the plan . . . a separate payment" for: (1) an amount equal to the premium for coverage of non-Hyde abortion care; and (2) an amount equal to the premium for all other services under the plan, after accounting for the enrollee's receipt of federal subsidies. *Id*. § 18023(b)(2)(B). Issuers must then deposit "all such separate payments into separate allocation accounts," one that is "used exclusively to pay for [non-Hyde abortion] services," and another used exclusively to pay for all other covered services. *Id.* § 18023(b)(2)(B)(ii), (C)(ii). Section 1303 requires that issuers estimate the abortion-related premium cost "as if such coverage were included for the entire population covered," and issuers cannot estimate the premium to be "less than $1 per enrollee, per month." *Id.* § 18023(b)(2)(D)(ii).

In a separate subsection, Section 1303 also established "[r]ules relating to notice" of a plan's abortion coverage. Under those rules, an exchange plan that provides coverage of non-Hyde abortion care "shall provide a notice to enrollees, *only* as part of the summary of benefits and coverage explanation, at the time of enrollment, of such coverage." *Id.* § 18023(b)(3)(A) (emphasis added). That notice, along with "*any* advertising used by the issuer with respect to the plan, any information provided by the Exchange, and any other information specified by" HHS "shall provide information *only* with respect to the total amount of the combined payments for [non-Hyde abortion services] and other services covered by the plan." *Id.* § 18023(b)(3)(B) (emphases added). These notice provisions constrain the ways in which HHS may compel issuers to make statements to consumers about the inclusion of abortion coverage in their plans and the cost of that coverage.

## II.     Initial Regulations and Guidance Implementing Section 1303

In 2012, HHS adopted regulations to implement Section 1303. *See Patient Protection and Affordable Care Act; Establishment of Exchanges and Qualified Health Plans; Exchange Standards for Employers*, 77 Fed. Reg. 18,310, 18,439–40 (Mar. 27, 2012) (codified at 45 C.F.R. pts. 155–157). These regulations, which largely repeated the statute, left issuers with wide discretion regarding how to comply with the ACA's separate-accounting requirement.

After the ACA exchanges became operational in 2014, HHS issued further guidance emphasizing that Section 1303 did not "specify the method an issuer must use to comply" with Section 1303's requirement that issues collect "separate payment[s]" from enrollees. Notice of Benefit and Payment Parameters for 2016, 80 Fed. Reg. 10,750, 10,840 (Feb. 27, 2015) (codified at 45 C.F.R. pts. 144, 147, 153–56, and 158). HHS explained that issuers could satisfy this requirement "in a number of ways," including by "[s]ending the enrollee a single monthly invoice or bill that separately itemizes the premium amount for non-excepted abortion services; sending a separate monthly bill for these services; or sending the enrollee a notice at or soon after the time of enrollment that the monthly invoice or bill will include a separate charge for such services and specify the charge." *Id.*; *see also id.* at 10,841 (affirming guidance in the proposed rule to the same effect). HHS also interpreted Section 1303 to permit consumers to "pay the premium payment for non-excepted abortion services and the separate payment for all other services in a single transaction," so long as the issuer deposited "the two separate payments into the issuer's two separate allocation accounts." *Id.* at 10,840. HHS explained that these options for issuers and consumers would "minimiz[e] burden," while serving Section 1303's purpose of ensuring that federal funds are not used to provide non-Hyde abortion care. *Id.* at 10,841.

### III. Adoption of the Separate-Billing Rule

#### A. Proposed Rule

In November 2018, just one month after HHS publicly touted its efforts to "remove regulatory obstacles" that "drive up the cost of healthcare,"[2] it announced a proposed rule that would impose precisely such obstacles and costs on issuers and enrollees. *See* Patient Protection and Affordable Care Act; Exchange Program Integrity, 83 Fed. Reg. 56,015 (Nov. 9, 2018) (hereinafter, the "Proposed Rule").

Under the Proposed Rule, issuers would be required to send enrollees whose plans included non-Hyde abortion coverage two separate bills—one for the abortion-related portion of the premium, and one for the remainder of the premium—in two separate pieces of correspondence. The Proposed Rule also contemplated that issuers would have to tell enrollees to pay those bills using two transactions but could not terminate enrollees' plans if enrollees nevertheless paid their full premium using a single transaction. *Id.* at 56,023. In contrast, the Proposed Rule indicated that enrollees who failed to pay the abortion-related portion of the premium altogether would be subject to existing "state and federal rules regarding grace periods," which may ultimately result in termination upon the expiration of any such period. *Id.* HHS acknowledged that the language of Section 1303 did not require separate bills and consumer transactions but stated that its proposal would "better align" the regulations with the statute's intent. *Id.* at 56,022. HHS proposed to require implementation immediately upon the rule's effective date. *Id.*

---

[2] HHS, *Secretary Azar Highlights Recognition of HHS as a Top Agency for Regulatory Reform* (Oct. 17, 2018), https://www.hhs.gov/about/news/2018/10/17/secretary-azar-highlights-recognition-of-hhs-as-a-top-agency-for-regulatory-reform.html.

HHS received more than 74,000 comments on the Proposed Rule.[3] Most commenters opposed the proposal and asked that it be withdrawn, while a "minority . . . summarily supported the policy." 84 Fed. Reg. at 71,684. Commenters warned that the Proposed Rule would wreak havoc on exchanges and induce issuers to drop abortion coverage in states where that remained an option, raise consumer premiums, or leave the exchanges altogether. *See, e.g.*, Ass'n of Community Affiliated Plans Comment at 5, [AR__] (hereinafter, "ACAP Comment") (describing issuers dropping non-Hyde abortion coverage as "easily anticipated"); *see also, e.g.*, Attorneys General of California, et al., Comment (hereinafter, "California AG Comment") at 3–5, [AR__]; DC Health Benefit Exchange Authority Comment at 3, [AR__].

Issuer representatives, including the Blue Cross Blue Shield Association ("BCBSA") and America's Health Insurance Plans ("AHIP"), opposed the Proposed Rule and provided detailed descriptions of its costs, showing that HHS had massively underestimated the number of affected consumers and the rule's impact. AHIP explained that the rule would require changes to nearly "every aspect of the enrollment and billing processes." AHIP Comment at 10, [AR__]; *see also, e.g.*, BCBSA Comment at 6, [AR__]; ACAP Comment at 3–4, [AR__]; Connect for Health Colorado Comment at 5–7, [AR__]. Commenters emphasized, for example, that "many issuers do not have the ability to generate two separate bills for one policy, requiring them to have to issue two policies per subscriber" in order to comply with the rule. BCBSA Comment at 4, [AR__].

Issuer and exchange representatives explained why the industry needed a minimum of twelve to eighteen months—or even longer—to implement any rule, including time to test new systems before expecting consumers to interact with them and time to educate enrollees about the

---

[3] The administrative docket for the Final Rule, including comments on the Proposed Rule, is available at https://www.regulations.gov/docket?D=CMS-2018-0135.

new requirements to ensure payment. *See, e.g.*, AHIP Comment at 11, [AR__] (stating that sixty-seven percent of respondents to a trade association's internal survey said the rule would take at least eighteen months to implement); BCBSA Comment at 4, [AR__] (stating most issuers would require two years to implement the rule); California Ass'n of Health Plans Comment at 3, [AR__] (estimating a "minimum of 18–24 months" to implement the rule); Connect for Health Colorado Comment at 8, [AR__] (describing need for extended period of time to develop "consumer education materials aimed at reducing the muddle created" by the rule).

Insurers and other commenters also emphasized that implementation in the middle of a plan year would bring additional confusion and costs. *See, e.g.*, AHIP Comment at 11, [AR__]. For this reason, the National Association of Insurance Commissioners ("NAIC"), which represents the chief insurance regulators in all fifty states and the District of Columbia, concluded that mid-year implementation would impose "undue burdens" on affected parties and that the rule, "as with nearly any change applicable [to] individual market issuers, [should] be made effective to coincide with the beginning of a plan year." NAIC Comment at 2, [AR__].

Other commenters explained that the Proposed Rule would lead to widespread consumer confusion and inadvertent failure to pay the abortion-related premium. They advised HHS that some consumers would inaccurately believe that a separate bill was a scam, an error by the issuer, or a charge for coverage that they did not request. *See, e.g.*, Planned Parenthood Federation of America Comment (hereinafter, "PPFA Comment") at 5, [AR__]; ACAP Comment at 4–5, [AR__]; *see also* BCBSA Comment at 3, [AR__] (emphasizing that consumers are already "inundated with required notices and mailings from a broad range of companies and industries" and thus "frequently do not read everything issuers send").

Because of the risk of consumer confusion and inadvertent non-payment, commenters warned that many individuals would have their entire insurance plans terminated for non-payment, or never be able to obtain coverage in the first place if they failed to pay the first month's premium in full. For example, Planned Parenthood Federation of America cited a study showing that sixty percent of consumers who were given two separate bills requiring two separate transfers of funds to purchase health insurance "did not complete the process correctly." PPFA Comment at 6, [AR__]; *see also, e.g.*, Blue Shield of California Comment at 2, [AR__] (describing 100,000 current enrollees who re-enroll in coverage each year by making automatic credit card payments, each of whom would need to establish a second automatic transaction under the rule to re-enroll); Vermont Legal Aid Comment at 1–2, [AR__]; Washington Health Benefit Exchange Comment at 2, [AR__]. Commenters described how the Proposed Rule's harms would fall most heavily on consumers who already struggle to navigate the healthcare system, including people with disabilities and limited English proficiency. *See, e.g.*, Asian & Pacific Islander American Health Forum Comment at 4, [AR__]; National Latina Institute for Reproductive Health Comment at 4–5, [AR__]. They also explained that consumers who were unable to obtain or maintain coverage because of the rule would generally need to wait until the following plan year's open enrollment period to try to enroll again. *See, e.g.*, American College of Obstetricians & Gynecologists Comment (hereinafter, "ACOG Comment") at 5, [AR__]; California AG Comment at 4, [AR__].

Patient advocates also described the harms to individuals who lose abortion coverage that they later need or who have their entire insurance plans terminated. They pointed to high out-of-pocket costs; delays in access to care, including abortion care (with attendant enhanced risk to patient health); interruptions in medical treatment for patients with chronic or serious health conditions; and potentially insurmountable financial barriers that impede individuals from

obtaining the care they need. *See, e.g.*, PPFA Comment at 10, [AR__]; ACOG Comment at 5, [AR__]; Physicians for Reproductive Health Comment at 4, [AR__]. As they explained, the loss of coverage would threaten the health, well-being, and economic security of patients nationwide, and "disproportionately impact underserved and medically-vulnerable communities." American Public Health Ass'n Comment at 4, [AR__]; *see also, e.g.*, Healthcare Ass'n of New York State Comment at 2, [AR__] (explaining that "loss of coverage for consumers will negatively impact payment to providers for those services" and providers' "ability to provide patient care").

Commenters also submitted evidence showing that consumers would find the rule change burdensome and frustrating, even if they were able to keep their coverage. For example, one trade association commissioned a survey of consumers who purchased their own health insurance. It reported that eighty-nine percent said that paying two bills every month would be a burden, and eighty-eight percent said that a premium increase would affect their ability to afford healthcare and other necessary expenses. AHIP Comment at 9, [AR__]; *see also, e.g.*, Connecticut Office of the Healthcare Advocate Comment at 1, [AR__] (calling the Proposed Rule "one of the most bizarre, counter-productive regulatory proposals that" the commenter had "ever seen in a long career as a government and healthcare attorney, and state and federal regulator, including as a Senior Executive Service official" with the Centers for Medicare and Medicaid Services).

Other commenters emphasized that these burdens were unnecessary to serve Section 1303's goal of ensuring that federal funds are not used for abortion services. They observed that HHS provided no evidence of ongoing non-compliance with the separate-accounting requirement, or that its existing enforcement authority was insufficient to deal with any non-compliance that might occur. *See, e.g.*, Connecticut Office of the Healthcare Advocate Comment at 3, [AR__]. They also pointed out that "[a]dministratively separating funds received through one payment

transaction is commonplace; for example, insurance companies often offer 'bundled' coverage (such as life and health insurance) that combines two distinct types of coverage under one payment transaction." Center on Budget and Policy Priorities Comment at 2, [AR__].

### B.  Final Rule

Despite this public outcry, in December 2019, HHS issued the Final Rule, which it recognized would affect more than three million enrollees, 84 Fed. Reg. at 71,706, roughly one-third of individual-market insurance plans on exchanges, and twenty-one states where at least one exchange plan included abortion coverage, *id.* at 71,696. As a small nod to the overwhelming opposition to the Proposed Rule, HHS decided not to require issuers to make "separate mailings with separate postage, as proposed," *id.* at 71,685, permitting issuers to send two bills in the same envelope.

Aside from this and another small tweak, HHS made no substantive changes to address commenters' serious concerns. The Final Rule still mandated that issuers send each policy holder separate monthly bills for each of the amounts attributable to the abortion-related coverage and all other coverage, "either by sending separate paper bills which may be in the same envelope or mailing, or by sending separate bills electronically, which must be in separate emails or electronic communications." *Id.* at 71,710–11, to be codified at § 156.280(e)(2). It estimated that because of this requirement, issuers and state exchanges that conduct their own premium billing would have to send an additional "1.82 million separate paper bills [to consumers] per month." *Id.* at 71,699.

The Final Rule also directed issuers to "[i]nstruct the policy holder to pay each of" the bills "through separate transactions." *Id.* at 71,711, to be codified at § 156.280(e)(2). It provided that if a policyholder disregards that instruction, the issuer cannot refuse the payment or terminate coverage. *Id.* HHS stated that under these circumstances, the issuer must "treat the portion of the

premium attributable to coverage of non-Hyde abortion services as a separate payment," as the previous regulations *already* permitted the issuer to do, and the issuer would have an obligation to "disaggregate the amounts" and place them "in [its] separate allocation accounts." *Id*. at 71,685.

HHS again recognized that the Final Rule's measures were not necessary to comply with Section 1303's mandate that an issuer collect "separate payment[s]" from enrollees, since Section 1303 does "not specify the method a [plan] issuer must use to comply." *Id.* at 71,683; *see also id.* at 71,694 (stating that the Final Rule "does not wholly depart from the previous interpretation, it merely refines it to better reflect the statute"). HHS also conceded that the flexible "methods of itemizing or providing advance notice about the amounts" due for each portion of a consumer's premium—compliance options permitted under the previous rules—"arguably identifie[d] two 'separate' amounts for two separate purposes," which HHS believed was consistent with the statutory text. *Id.* at 71,693. Moreover, despite wrapping the Final Rule in the guise of program "integrity," HHS conceded that there was no evidence of issuers failing to comply with Section 1303's separate-accounting requirement. *Id.* at 71,692.

HHS also acknowledged that the Separate-Billing Rule would be far more burdensome and costly than anticipated in the Proposed Rule, even with the minor modification permitting issuers to send separate bills in a single envelope. For example, HHS estimated that issuers would spend more than 2.96 *million* hours making one-time changes to their technological systems, billing-related outreach, and call-center training in 2020, *id.* at 71,697, up from the Proposed Rule's estimate of 750 hours total, 83 Fed. Reg. at 56,025. Thus, the actual time needed to implement just a portion of the Final Rule in 2020 is nearly *4,000* times greater than HHS predicted when it proposed the rule, yet it adopted the Proposed Rule with little change.

Based on this analysis, and without quantifying the majority of costs that the Final Rule imposed, HHS concluded that the Final Rule would cost at least $1.26 billion between 2020 and 2024. 84 Fed. Reg. at 71,707. HHS also estimated that the cost to consumers would exceed $135 million between 2020 and 2024, based only on the additional time that each policyholder would spend reading and understanding separate bills. *Id.* at 71,706–07. In a departure from the Proposed Rule, HHS did not quantify consumers' time spent making two separate transactions every month to pay their insurance premium; instead, it inexplicably treated these costs—which it called "[p]otential"—as if it were uncertain whether consumers would incur them. *Id.* at 71,700.

HHS agreed that the Separate-Billing Rule would have many of the negative effects on coverage and access that commenters feared. It conceded, for example, that "even with fulsome outreach and education efforts to explain the billing scheme to the policy holder, consumer confusion could still lead to inadvertent coverage losses." *Id.* at 71,686. To "fix" this problem created by the rule, HHS suggested that it might propose further rulemaking to change its regulations governing termination for non-payment of premiums, but it warned that its statements should not "be construed as a representation or guarantee" that HHS would, in fact, ever address the problem of consumers losing coverage. *Id.* at 71,686 n.12. HHS thus left plan enrollees, the most vulnerable parties affected by the Final Rule, to decipher separate bills for themselves, while acknowledging that the resulting confusion could cause some of them to lose coverage.

HHS also stated that it would not take enforcement action against an issuer that adopted a policy of not placing an enrollee into a grace period and not terminating coverage "based solely on the policy holder's failure to pay the portion of the premium attributable to non-Hyde abortion services." *Id.* at 71,686. However, it did not require issuers to adopt such a policy, and it made clear that issuers "would still be required to collect the premium for the non-Hyde abortion

coverage." *Id*. Thus, even if an issuer voluntarily adopts a policy of non-termination, its enrollees who inadvertently fail to pay their premium for non-Hyde abortion care will still accrue a debt to the issuer each month they fall short. *Id*.

Despite estimating that the Final Rule would cost well over $1.26 billion by the end of 2024, HHS did not identify a *single* quantifiable benefit from it. Instead, while acknowledging that Section 1303's language does not dictate what the Final Rule requires, HHS asserted that the "primary" benefit was "better align[ment]" of the regulations "with the intent of section 1303." *Id*. at 71,685; *see also, e.g.*, *id*. at 71,688; *id*. at 70,671. HHS also asserted that the Final Rule might "increase transparency for policy holders who object on the basis of conscience to coverage of non-Hyde abortion services" in their plans. *Id*. at 71,691; *see also id*. at 71,707 (asserting benefits to policyholders who "seek a better understanding of what their health care dollars are purchasing"). HHS did not explain how this asserted benefit was consistent with portions of Section 1303 that already require notice to consumers of non-Hyde abortion coverage. *See* 42 U.S.C. § 18023(b)(3). Nor did it address why the Final Rule's requirements doubling the number of necessary bills and consumer transactions—month after month, year after year—were necessary to achieve this notice objective, even assuming that mandatory notice more extensive than Section 1303 already requires is permissible.

In addition to the separate-billing provisions, the Final Rule announced a new "enforcement polic[y]," 84 Fed. Reg. at 71,687, on which HHS had not sought public comment and which was not foreshadowed by the Proposed Rule. Under this Opt-Out Policy, HHS committed not to take enforcement action against issuers "that modify the benefits of a plan either at the time of enrollment or during a plan year to effectively allow enrollees to opt out of coverage of non-Hyde abortion services." *Id*. at 71,686. An opt-out will apply to the policy holder and to

anyone else, such as a spouse or adult child, reliant on that same policy, and it cannot be retracted for the remainder of the plan year. *Id*. Under the Opt-Out Policy, individuals who opt out will no longer have an obligation to pay the non-Hyde abortion care premium, and they cannot use the plan's abortion coverage. *Id.*

Unlike its burdensome requirement that consumers make two transactions each month for a plan including abortion coverage, HHS encouraged issuers to make *opting out* of abortion coverage seamless by "includ[ing] on the separate bill for coverage of non-Hyde abortion services or separate electronic communication an option (such as a check box or option button) where the policy holder can affirmatively indicate their intent to opt-out of such coverage by not paying the separate bill." *Id.* at 71,687. HHS suggested that issuers could rely on the Opt-Out Policy to minimize the "number of enrollee terminations as a result of delinquent premium payments," *id.* at 71,706, a problem of the Separate-Billing Rule's own creation.

Finally, HHS also rejected commenters' pleas not to require implementation of the Separate-Billing Rule during a plan year. It announced that the Final Rule would take effect on February 25, 2020, and that issuers would have only six months from the publication date—or until June 27, 2020—to begin sending separate monthly bills and telling consumers to make payments in separate transactions. *Id.* at 71,686–87. It provided no explanation for its conclusion that six months was sufficient time, contending only that expedited implementation would provide the expected "benefits" of the rule more quickly.

## IV. This Litigation and The Rule's Impact on Plaintiffs

Plaintiff Planned Parenthood of Maryland, Inc. ("PPM") is a nonprofit reproductive healthcare provider that operates seven Maryland health centers, where it provides, among other services, birth control; testing and treatment for sexually transmitted infections; pregnancy testing and prenatal referrals; breast and cervical cancer screenings; and safe, legal abortion. Decl. of

Karen Nelson (hereinafter, "Nelson Decl.") ¶¶ 6–8, attached as Ex. A. PPM accepts insurance from and regularly provides care, including abortion care, to patients who rely on individual plans from the Maryland exchange. *Id.* ¶ 11. Although Maryland does not require exchange plans to cover non-Hyde abortion care, every plan offered on the exchange currently does. *Id.* ¶ 19. Implementation of the Separate-Billing Rule threatens PPM's patients with loss of abortion coverage as a covered benefit, termination of policy coverage due to inadvertent non-payment, and higher premiums that may put insurance coverage or access to PPM's care out of patients' financial reach. *Id.* ¶¶ 20–21, 26–30. In addition, many patients who lose coverage will still turn to PPM for care but will do so without insurance reimbursement, resulting in additional costs that further strain PPM's limited resources to serve patients with financial need. *Id.* ¶ 24.

Plaintiffs Kirsty Hambrick, Rebecca Barson, Mariel DiDato, and Tanja Hollander (hereinafter, the "Consumer Plaintiffs") are from Maryland, the District of Columbia, New Jersey, and Maine, respectively. Decl. of Kirsty Hambrick (hereinafter, "Hambrick Decl.") ¶ 1, attached as Ex. B; Decl. of Rebecca Barson (hereinafter, "Barson Decl.") ¶ 1, attached as Ex. C; Decl. of Mariel DiDato (hereinafter, "DiDato Decl.") ¶ 1, attached as Ex. D; Decl. of Tanja Hollander (hereinafter, "Hollander Decl.") ¶ 1, attached as Ex. E. They purchase exchange-based health insurance that covers non-Hyde abortion care. They are of reproductive age and capable of becoming pregnant, they want abortion coverage, and they might use such coverage in the future. Hambrick Decl. ¶¶ 2–4; Barson Decl. ¶¶ 2, 4; DiDato Decl. ¶¶ 2–4; Hollander Decl. ¶¶ 2–3.

When the Separate-Billing Rule is implemented, each of the Consumer Plaintiffs will have to spend additional time reading and reviewing two monthly bills and making separate transactions to pay their premiums. Hambrick Decl. ¶¶ 16–18; Barson Decl. ¶¶ 16–21; DiDato Decl. ¶¶ 14–18; Hollander Decl. ¶¶ 11–15. Each will face increased consumer premiums caused by the Final Rule.

Hambrick Decl. ¶¶ 12–14; Barson Decl. ¶¶ 14–15; DiDato Decl. ¶¶ 12–13; Hollander Decl. ¶¶ 8–10. Each Consumer Plaintiff will also be exposed to new risks of coverage loss for inadvertent non-payment. Hambrick Decl. ¶¶ 15–16; Barson Decl. ¶ 16; DiDato Decl. ¶ 14; Hollander Decl. ¶ 14. A loss of coverage would saddle the Consumer Plaintiffs with out-of-pocket healthcare costs that are now covered by their plans, and Plaintiffs Barson and DiDato could face penalties for failure to maintain consistent health insurance coverage as required by their respective states. Barson Decl. ¶ 19; DiDato Decl. ¶ 19. A loss of coverage would be particularly devastating for Plaintiffs Barson and Hambrick, who have existing health conditions that require uninterrupted access to care. Barson Decl. ¶¶ 17–19; Hambrick Decl. ¶ 19. In addition, Plaintiffs Hambrick, Barson, and DiDato live in states that permit, but do not require, issuers to cover non-Hyde abortion care, so they face the loss of abortion as a covered service in their preferred exchange plans as a result of the Final Rule. Hambrick Decl. ¶¶ 9–11; Barson Decl. ¶¶ 8–13; DiDato Decl. ¶¶ 9–11. If these plaintiffs lose abortion coverage, they will be required to seek any needed abortion care without insurance to reimburse its costs, all while navigating many other barriers to abortion access.

After HHS adopted the Separate-Billing Rule, Plaintiffs brought this APA challenge to have the rule declared unlawful and vacated. Their lawsuit is one of three currently pending against HHS regarding the Separate-Billing Rule's legality. *See California v. HHS*, No. 4:20-cv-00682 (N.D. Cal. filed Jan. 30, 2020); *Washington v. Azar II*, No. 2:20-cv-00047 (E.D. Wash. filed Jan. 31, 2020).

## STANDARD OF REVIEW

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp.*

*v. Catrett*, 477 U.S. 317, 322 (1986). Under the APA, "a reviewing court must 'set aside agency action, findings, and conclusions' when they are found to be 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,'" *W. Va. Dep't of Health & Human Res. v. Sebelius*, 649 F.3d 217, 222 (4th Cir. 2011) (quoting 5 U.S.C. § 706(2)(A)), or where an agency's action was taken without procedure required by law, 5 U.S.C. § 706(2)(A).

## ARGUMENT

### I.     The Separate-Billing Rule Is Arbitrary and Capricious.

"One of the basic procedural requirements of administrative rulemaking is that an agency must give adequate reasons for its decisions." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125–26 (2016). It "must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id.* (quoting *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). Agency action fails to satisfy this standard and is instead arbitrary and capricious where it "relie[s] on factors which Congress has not intended it to consider, entirely fail[s] to consider an important aspect of the problem, offer[s] an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Sierra Club v. Dep't of the Interior*, 899 F.3d 260, 293 (4th Cir. 2018) (quoting *State Farm*, 463 U.S. at 43). Arbitrary and capricious agency action is invalid under the APA and must be set aside. 5 U.S.C. § 706(2)(A).

### A.     HHS's Justifications for The Rule Are Illogical and Rest on Nonexistent Benefits.

*1.     Regulatory alignment with Section 1303.* HHS attempted to justify the rule as necessary to "better align" its regulations with Section 1303's intent. *E.g.*, 84 Fed. Reg. at 71,685; *id.* at 71,688; *id.* at 71,691. It repeatedly invoked Section 1303's mandate that an issuer collect

"separate payment[s]" for abortion and non-abortion-related coverage to justify dismissal of all manner of costs, including increased premiums, terminations of coverage, consumer confusion, and expenditure of time. *See, e.g.*, *id.* at 71,688; *id.* at 70,671.

HHS's reliance on the "benefit" of better alignment between the regulations and Section 1303's intent is wholly illogical. Where, as here, an agency changes its existing policies, it must provide a reasoned explanation for the change, *see, e.g.*, *Nat'l Cable & Telecomm'ns Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981–982 (2005), and at least "show that there are good reasons for the new policy," *FCC v. Fox Television Stations*, 556 U.S. 502, 515 (2009); *see also, e.g.*, *Jimenez-Cedillo v. Sessions*, 885 F.3d 292, 298 (4th Cir. 2018). HHS has not done so here.

First, HHS recognizes that the term "separate payment" in Section 1303 is ambiguous, and that the flexible compliance options permitted by previous HHS regulations and guidance were consistent with it. 84 Fed. Reg. at 71,693. Indeed, the Final Rule makes clear that when an enrollee does not follow instructions to make separate premium transactions, the issuer must nevertheless treat the single transaction as constituting "separate payments" under Section 1303 and must disaggregate those "payments" before placing them in separate accounts, just as issuers have been doing for years under the previous rules. *Id.* at 71,685. Although HHS repeatedly asserts that the Final Rule offers a "better" interpretation of the statute because it is more consistent with Section 1303's intent, it fails to explain what is better about an interpretation that imposes massive new costs, reduces flexibility provided by Section 1303, and in some cases results in issuers using the very same compliance mechanisms they used under the earlier rules.

Second, HHS concedes that the Final Rule is not based on any evidence of issuer non-compliance with Section 1303's separate-accounting requirement. Despite imposing more than $1.26 billion in costs (by its own estimation), HHS "offers no data, studies or other references to

indicate that the current structure is failing to shield public funds from paying for abortion services." Connecticut Office of the Healthcare Advocate Comment at 3–4, [AR__]; *see also, e.g.*, HealthSource RI Comment at 3, [AR__]; *Am. Equity Inv. Life Ins. Co. v. S.E.C.*, 613 F.3d 166, 179 (D.C. Cir. 2010) (holding agency action arbitrary and capricious where the agency failed "to determine whether, under the existing regime, sufficient protections existed" to provide the benefits asserted to justify the rule). That omission is critical because Section 1303's separate-accounting requirement was intended to implement a "[p]rohibition on the use of [f]ederal funds" for non-Hyde abortion care. 42 U.S.C. § 18023. It does not impose restrictions on issuers' ability to offer abortion coverage paid for by private or state dollars. The Final Rule's requirement that issuers send separate bills and that consumers pay those bills in separate transactions every month does nothing to further this prohibition on the *use* of federal dollars for abortion care. In fact, the Final Rule could make it more difficult for issuers to keep track of which payments belong where, because they will have to "process[] and reconcil[e] separate payments" from some enrollees and single-transaction payments from others who do not understand or follow issuers' instructions. *See, e.g.*, 84 Fed. Reg. at 71,703 (recognizing that under the Final Rule, issuers will have to conduct "manual review[s] where automated processes are not able to reconcile enrollments and payments").

Third, HHS's repeated reliance on Section 1303's purported "intent" fails to reconcile the rule with the ACA's purpose "to increase the number of Americans covered by health insurance and decrease the cost of health care." *Nat'l Fed'n of Indep. Bus.*, 567 U.S. at 538. HHS concedes that the Final Rule will do the opposite without explaining how this impact is consistent with the statute. 84 Fed. Reg. at 71,701 (citing "[i]ncrease in premiums beginning in plan year 2021"); *id.* at 71,703 (projecting annual issuer costs to manage "the grace period process for a higher volume

of enrollees who enter a non-payment grace period," including costs related to carrying out "termination[s]" for non-payment). In this respect, HHS's adoption of the rule is a textbook example of arbitrary and capricious agency action. *See Sierra Club*, 899 F.3d at 293 (holding that an agency's approval of a pipeline right-of-way was arbitrary and capricious where record evidence indicated that the pipeline was "inconsistent with and in derogation of the purposes" of the Blue Ridge Parkway where it was located and of the National Park System); *Ohio River Valley Envtl. Coal., Inc. v. Kempthorne*, 473 F.3d 94, 103 (4th Cir. 2006) (holding action arbitrary and capricious where the agency made a program "less environmentally protective" and did not explain how the changes were "nevertheless consistent with" the environmental-protection statute governing the action).

2. **Consumer notice**. The only other "benefit" HHS relied on in the rule was allegedly increased transparency for consumers opposed to abortion, who could use information conveyed by separate bills and the process of submitting separate premium transactions to understand that their plans cover abortion and to learn what portion of their private dollars pay for it. *See, e.g.*, 84 Fed. Reg. at 71,694. Congress did not intend for HHS to consider this asserted "benefit" in adopting the Final Rule, and it makes no sense that HHS did so here.

First, the Separate-Billing Rule purports to interpret Section 1303's separate-accounting requirement, 42 U.S.C. § 18023(b)(2), not Section 1303's separate provisions regarding notice to consumers of abortion coverage, *id.* § 18023(b)(3). The separate-accounting requirement concerns a prohibition on the use of *federal funds* for non-Hyde abortion care. It is not concerned with consumers who "object to purchasing" plans that "include coverage of non-Hyde abortion services" paid for by *private funds*, as that coverage must be under Section 1303. 84 Fed. Reg. at 71,686; *see also, e.g.*, *id.* at 71,707 (asserting benefits to policyholders who "seek a better

understanding of what *their* health care dollars are purchasing" (emphasis added)). HHS's reliance on a supposed benefit that "Congress has not intended it to consider" in interpreting Section 1303's separate-accounting requirement renders the Final Rule arbitrary and capricious. *Sierra Club*, 899 F.3d at 293.

Moreover, even if an interest in providing additional notice to consumers who object to abortion coverage were legitimate in interpreting Section 1303's separate-accounting requirement, it is completely irrational to further that interest by requiring issuers to send separate bills to consumers, month after month, for two portions of the same premium and to instruct consumers to pay those bills in separate transactions. HHS recognized that simply reading and understanding the bills would require an hour of each consumer's time in the first month of the rule's implementation, 84 Fed. Reg. 71,706, and up to an hour of additional time in the following twelve months (and every year thereafter), *id*. at 71,707. There is no logical basis for these repetitive costs. It is likewise irrational to impose these costs for the purported benefit of a minority of consumers who already receive what Congress determined was fair notice of coverage terms, *see* 42 U.S.C. § 18023(b)(3), at the expense of the vast majority of enrollees satisfied with their coverage who—because of the Final Rule—might lose it entirely or find themselves without abortion coverage they desperately need.

### B.     The Separate-Billing Rule's Imposition of Massive Costs for No Discernible Benefit Is Irrational.

The Final Rule (by HHS's own estimation) will impose more than $1.26 billion in costs on consumers, issuers, states, and the federal government. It will also result in other potentially catastrophic but unquantified costs, including the termination of some consumers' insurance policies, imposition of high out-of-pocket medical costs, and additional financial barriers to abortion and other healthcare among vulnerable patients. Despite this burden, HHS could not

identify a *single* quantifiable benefit of the Final Rule, and—as discussed above—tried to justify the rule using nonexistent benefits or considerations that Congress clearly did not intend for the agency to consider in this context. Simply put, the Final Rule is an overwhelmingly expensive "solution for a non-existent problem." DC Health Benefit Exchange Authority Comment at 2, [AR__].

Imposing such massive costs for no discernible benefit is arbitrary and capricious under the APA. *See Michigan v. EPA*, 135 S. Ct. 2699, 2707 (2015). Moreover, even if there were some legitimate, qualitative benefit to the Final Rule, there is no question that the rule "does significantly more harm than good." *Id.* It is simply not rational to "impose billions of dollars in economic costs in return for a few dollars in [other] benefits," *id.*, much less in return for some vague notion that the agency's current interpretation is simply "better" than the last, more flexible one. *See also Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 225–26 (2009) ("[W]hether it is 'reasonable' to bear a particular cost may well depend on the resulting benefits….").

## C. HHS Ignored Significant Costs of The Final Rule to The Most Vulnerable Parties Affected.

As discussed above, the Final Rule's costs, as estimated by HHS, are unjustifiable in relation to the rule's nonexistent benefits. In fact, however, even these costs are wildly underinclusive. HHS's failure to acknowledge and consider the full costs of the rule was arbitrary and capricious.

Most egregiously, HHS failed to quantify any time or other costs that consumers will incur from actually making separate monthly transactions to pay their premiums. Indeed, it treated these costs as if they are not certain to be incurred. Specifically, in the Proposed Rule, HHS predicted that consumers would spend ten minutes per month making premium payments through separate transactions and reading and reviewing separate bills, for a total burden of two hours per year

(valued at roughly $24 in each consumer's time). 83 Fed. Reg. at 56,028–29. In contrast, the Final Rule jettisoned cost estimates related to making separate monthly transactions and inexplicably began to treat these costs as if they might not arise. *See* 84 Fed. Reg. at 71,700 (identifying only in qualitative terms "[p]otential increased costs incurred by enrollees who *choose* to make separate payments for coverage of non-Hyde abortion services" (emphasis added)); *id.* at 71,706 (stating that "the burden may be moderately higher for those policy holders who follow instructions to pay in separate transactions" than for those who do not). As a result, the only consumer costs quantified in the Final Rule relate to a consumer's time spent reading and understanding bills. *Id.* at 71,706; *see also* CMS, Supporting Statement for Billing and Collection of the Separate Payment for Certain Abortion Services (same in a CMS statement to the Office Management and Budget to justify the Final Rule's information-collection requirements under the Paperwork Reduction Act).[4]

A consumer's payment of separate premium transactions is *central* to the rule, so it was fundamentally irrational for the agency to treat the costs of making two separate payment transactions as both uncertain to be incurred and unquantifiable. At the least, the agency could have relied on the same methods used to estimate consumer time spent reading and reviewing separate bills to also estimate the more significant time associated with actually *making* two separate premium transactions every month. *See, e.g.*, *Pub. Citizen v. Fed. Motor Carrier Safety Admin.*, 374 F.3d 1209, 1222 (D.C. Cir. 2004) (faulting agency for not quantifying costs where it clearly had available data and methods to do so); *Bus. Roundtable v. S.E.C.*, 647 F.3d 1144, 1150 (D.C. Cir. 2011) (faulting agency for failing to quantify benefits where empirical evidence "was readily available"). The need for HHS to acknowledge these consumer costs is all the more

---

[4] *Available at* https://www.cms.gov/Regulations-and-Guidance/Legislation/Paperwork ReductionActof1995/PRA-Listing-Items/CMS-10681.

important in light of record evidence showing that the vast majority of exchange enrollees are not able to or do not prefer to use automatic payment options online. *See, e.g.*, Washington Health Benefit Exchange Comment at 2, [AR__] (stating that eighty percent of state enrollees do not use auto-pay methods). In the Final Rule, HHS did not recognize that it departed from the approach it had suggested in the Proposed Rule, which acknowledged that these costs were certain and could be quantified, nor did HHS justify this departure. That "unexplained inconsistency . . . indicates that the agency's action is arbitrary and capricious, and therefore unlawful." *Jimenez-Cedillo*, 885 F.3d at 298 (internal quotation marks omitted).

Similarly, HHS failed to quantify, and in some cases failed to acknowledge as certain, other substantial costs to consumers, thus precluding an accurate assessment of the rule's burdens on the most vulnerable parties affected. For example, HHS stated that the Final Rule would lead to an increase in consumer premiums of up to one percent annually, and that those increases would reduce enrollment. 84 Fed. Reg. at 71,704. However, despite having robust data regarding consumer premiums around the country, *see, e.g.*, CMS, *2019 OEP State-Level Public Use File* (Nov. 27, 2019), https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/Marketplace-Products/2019_Open_Enrollment, it did not even attempt to estimate the impact of premium increases and resulting enrollment reductions on the rule's estimated costs. HHS also ignored consumer time spent correcting billing issues that arise, despite acknowledging, for example, that insurers would have to "add[] new processes to address scenarios where an enrollee's payment is not processed because the bank flags payment as potentially fraudulent," an outcome that HHS admitted was "expected to occur for multiple payments in the same day or $1 payments." 84 Fed. Reg. at 71,703. Since Section 1303 sets a minimum payment amount of $1 per month for non-Hyde abortion coverage, and consumers will presumably make their insurance

transactions on the same day, the likelihood of such billing issues is high. *See, e.g.*, Blue Shield of California Comment at 3, [AR__] (projecting "grace period and delinquency volume to grow by 40%–60%, given the confusion of separate bills and the likelihood of not paying both bills"); California AG Comments at 11, [AR__] (stating that Washington expected the rule to result in "increased calls to the Exchange's customer service center by at least 30 percent of households enrolled" in a plan); National Ass'n of Health Underwriters Comment at 3, [AR__] (describing as "very high" the "likelihood of consumers lapsing and having their coverage canceled" after a grace period). HHS did not try to quantify these massive costs to consumers, and in some cases, it simply pretended that the jury is still out as to whether the Final Rule will even impose them. *See generally* 84 Fed. Reg. at 71,700–01.

### D.     HHS Adopted an Arbitrary Implementation Deadline.

Issuer representatives uniformly told HHS that they would need a significant amount of time to implement the Separate-Billing Rule. Blue Cross Blue Shield Association, for example, stated that "most issuers would need up to two years for implementation." BCBSA Comment at 4, [AR__]; AHIP Comment at 11, [AR__] (more than two-thirds surveyed would need at least eighteen months). In particular, issuer representatives explained that implementation in the middle of the 2020 plan year would increase consumer confusion and leave issuers without a sufficient amount of time to test new systems required to comply with the rule and to train customer service staff. *See, e.g.*, AHIP Comment at 11, [AR__]; BCBSA Comment at 5, [AR__]. They also provided detailed descriptions of the tasks necessary to ensure compliance with the rule, including "changes to nearly every aspect of the enrollment and billing processes to identify impacted enrollees, generate and send multiple accurate invoices, collect multiple payments, and reconcile payment amounts." 84 Fed. Reg. at 71,697.

Despite this record evidence, HHS adopted a six-month implementation deadline, such that issuers will have to begin complying with the rule's requirements for separate bills and consumer transactions by June 27, 2020. HHS provided no explanation for its conclusion that six months would generally be sufficient for "issuers to implement the administrative and operational changes to billing processes necessary to comply with this policy." *Id.* at 71,689. Although HHS indicated that it would opt not to exercise its enforcement discretion with respect to some issuers that fail to meet the deadline despite working in good faith to do so, it indicated that it did not anticipate providing such enforcement relief for more than one year after the rule's publication, *id.* at 71,690, a date at the lowest end of industry estimates for necessary compliance time. In this respect, HHS's unexplained conclusion that most issuers could comply within six months was at odds with "specific, contradictory evidence" supplied by regulated entities and cannot be sustained. *Ergon-W. Va., Inc. v. EPA*, 896 F.3d 600, 613 (4th Cir. 2018); *see also, e.g.*, *United States v. F/V Alice Amanda*, 987 F.2d 1078, 1085 (4th Cir. 1993) (recognizing that a court "need not accept without question administrative pronouncements clearly at variance with established facts" (internal quotation marks omitted)); *Dow AgroSciences LLC v. Nat'l Marine Fisheries Serv.*, 707 F.3d 462, 471 (4th Cir. 2013) (holding arbitrary and capricious an agency's use of a laboratory-based assumption without any evidence that the assumption reflected field conditions).

HHS's only justification for the chosen implementation date was that it would "appropriately prioritize[] the goals of improved statutory alignment," 84 Fed. Reg. at 71,689, and was necessary to address some "commenters' concerns regarding the lack of transparency as to whether their [plan] covers non-Hyde abortion services, transparency that would [otherwise] be delayed," *id.* at 71,690. These flawed benefit assertions are even more irrational in this context than they are with respect to the remainder of the Final Rule, given the far greater expense

associated with implementation mid-plan year. As HHS acknowledged, the six-month implementation mandate would require issuers to pay a fifty percent premium in contract and overtime costs in the first year of the rule. *Id.* at 71,689; *id*. at 71,697. Moreover, this implementation deadline compounds consumer confusion by making changes to an issuer's billing process mid-plan year. As the National Association of Insurance Commissioners explained, "[c]onsumers can more easily adapt to new payment arrangements at the beginning of a plan year, when they expect premiums to be different and other changes to their plan to occur." NAIC Comment at 1, [AR__]. Despite these uncontradicted warnings, HHS's assessment of regulatory alternatives makes clear that it did not seriously consider *any* implementation deadline longer than six months. *See* 84 Fed. Reg. at 71,708 (justifying the implementation deadline as more accommodating than the three-month alternative HHS considered and the immediate effective date it had proposed).

### E. HHS Failed to Consider The Impact of The Opt-Out Policy on Issuers and Enrollees Who Seek to Maintain Abortion Coverage.

In addition to adopting an Opt-Out Policy at odds with Section 1303's plain language, *see infra* Part III, HHS failed to consider the financial impact of this policy on plans and enrollees who seek to maintain abortion coverage. Issuers must calculate the premium portion for non-Hyde abortion care based on the total enrollee population in a plan. 42 U.S.C. § 18023(b)(2)(B). However, as HHS itself suggested, plans may turn to this Opt-Out Policy as a way to deal with the many enrollees who will fail to pay the abortion-related premium out of confusion and otherwise face termination of coverage. 84 Fed. Reg. at 71,706. Accordingly, the number of opt-outs could be quite high given the ready pool of consumers seeking to avoid the Final Rule's pointless red tape. HHS made no attempt to identify the extent of this financial impact on plans or enrollees, nor did it even recognize that the Opt-Out Policy would have such an impact. This omission constitutes

a failure by the agency to consider an "important aspect of the problem," *State Farm*, 463 U.S. at 43, and renders the Final Rule arbitrary and capricious.

## II.      The Separate-Billing Rule Is Contrary to Section 1554 of the ACA.

The Separate-Billing Rule plainly runs afoul of Section 1554 of the ACA, which bars HHS from adopting regulations that "create[] any unreasonable barriers to the ability of individuals to obtain appropriate medical care," "impede[] timely access to health care services," or "limit[] the availability of health care treatment for the full duration of a patient's medical needs." 42 U.S.C. § 18114; *see also id.* § 300gg-91(a)(2) (defining "medical care" to include insurance coverage for care).

HHS recognized that some patients will lose all their insurance coverage due to inadvertent non-payment of the abortion-related premium, incurring out-of-pocket costs and experiencing interruptions in their healthcare. 84 Fed. Reg. at 71,688. This outcome will be particularly harmful for individuals with chronic or serious health conditions, who "need reliable healthcare coverage to manage their disease and lead healthy, productive lives." American Diabetes Ass'n, et al., Comment at 1, [AR__]; *see also, e.g.*, Connecticut Office of the Healthcare Advocate Comment at 5, [AR__]. The agency also acknowledged that the rule will lead to an annual consumer premium increase of up to one percent, and that enrollment in the exchanges "will be reduced" as a result of these increases. 84 Fed. Reg. at 71,704. It recognized that some insurers will drop abortion coverage, and although it did not quantify the out-of-pocket costs to affected enrollees, it acknowledged that some enrollees would incur costs for abortion care that were previously covered by insurance. *Id.* at 71,705. HHS also recognized that these costs could delay access to abortion, as enrollees attempted to raise funds necessary for care. *Id.* at 71,688. These outcomes—which the record shows are a certainty—simply cannot be squared with Section 1554.

HHS's passing discussion of Section 1554 in the Final Rule is unconvincing. First, HHS declared (without further explanation) that although the Proposed Rule "could have potentially led to a reduction in the availability of coverage of non-Hyde abortion services . . . thereby potentially increasing out-of-pocket costs for some women seeking those services," the Final Rule "decrease[d] the likelihood of these outcomes." *Id.* at 71,694. However, elsewhere in the rule, HHS acknowledged that these outcomes were expected, effectively conceding the violation of Section 1554. *See, e.g., id.* at 71,704 (stating that HHS expected issuers "would either cease offering coverage of non-Hyde abortion services . . . in the plan year following the effective date . . . or would pay for the increased administrative costs from a different revenue source"). In addition, it ignored numerous other harms that it concluded elsewhere in the Final Rule were certain to occur, including "termination[s]" of some consumers' entire insurance policies and a reduction in enrollment on the exchanges. *Id.* at 71,703–04; *id.* at 71,694; *see also* American Civil Liberties Union Comment at 3–4, [AR__] (explaining that a rule causing these harms violated Section 1554). In any event, the fact that the Proposed Rule was, in HHS's view, even more extreme and harmful than the Final Rule is irrelevant to whether the Final Rule is consistent with Section 1554. Were it otherwise, an agency could sidestep Section 1554 altogether just by proposing a more draconian rule than it ultimately planned to adopt.

Second, HHS contended that even if the Final Rule reduced coverage for abortion and increased out-of-pocket costs, it would not violate Section 1554 because issuers ultimately retain "discretion whether to cover non-Hyde abortion services in their [plans]; requiring a separate bill for these services does not limit that right." 84 Fed. Reg. at 71,694. Section 1554's scope is not so constrained. If Congress had intended to prohibit only rules that directly regulate, and thereby restrict, access to care, it could have said so. Instead, Congress made clear in Section 1554 that it

was also concerned with efforts by HHS to undermine access to care through less direct, yet equally harmful, means of obstruction. *See, e.g.*, 42 U.S.C. § 18114(1)–(3) (barring any regulation that "creates" certain barriers to care, "impedes" timely access to care, or "interferes" with certain patient-provider conversations).

### III.     The Separate-Billing Rule Is Contrary to The ACA's Mandate That All Enrollees Purchasing Exchange Plans with Abortion Coverage Pay for That Coverage.

Section 1303 of the ACA requires that issuers offering non-Hyde abortion coverage in exchange plans "shall . . . collect from each enrollee" the portion of the premium attributable to non-Hyde abortion care, in addition to the rest of the premium. 42 U.S.C. § 18023(b)(2)(B)(i). Congress's use of the word "shall" in this provision imposes a "discretionless obligation[]" on issuers to collect an abortion-related premium in plans that offer abortion coverage. *Lopez v. Davis*, 531 U.S. 230, 241 (2001).

In contrast, the Final Rule's Opt-Out Policy binds the government not to take enforcement action against any issuer that "allows an enrollee to opt out of coverage of non-Hyde abortion services by not paying the separate bill for such services." 84 Fed. Reg. at 71,686; *see also id.* at 71,687 (stating that enrollees who opt out would not be able to have their coverage reinstated by later making up the "portion of premium attributable to coverage of non-Hyde abortion services"). HHS's justification for the Opt-Out Policy rests on a fundamentally misguided interpretation of Section 1303: In HHS's view, an opt-out effectively creates "a modified plan that does not cover non-Hyde abortion services," and thereby removes an enrollee's "obligation to pay the required premium for such services." *Id.* at 71,686.

The interpretation of Section 1303 embodied in the Opt-Out Policy is at odds with the statute's plain language, which distinguishes between plans that offer non-Hyde abortion coverage to all enrollees, on one hand, *see* 42 U.S.C. § 18023(b)(1)(B)(ii), and plans that do not offer such

coverage to any enrollees, on the other, *see id.* § 18023(b)(1)(B)(i). Section 1303 leaves no room for the issuer of a single plan to offer non-Hyde abortion coverage to some enrollees but not others, or to permit enrollees—by exercising an opt out—to effectively transform a single plan (approved by the respective exchange and offered to consumers for purchase) into two separate plans, one with abortion coverage, and one without. To the contrary, Section 1303 requires an issuer of a plan that includes non-Hyde abortion coverage to estimate the abortion-related premium "as if such coverage were included for the entire population covered" by the plan and provides that the issuer "may not estimate such a cost at less than $1 per enrollee, per month." *Id.* § 18023(2)(D)(ii); *see also id.* § 300gg (identifying a comprehensive list of factors that issuers may consider when setting premium rates, and providing that the rate "shall not vary with respect to the particular plan or coverage involved by any other factor not described" in that list). The Opt-Out Policy leaves issuers and plan participants who maintain abortion coverage with the costs of such coverage, while exempting some enrollees in the same plan from paying anything at all for this portion of the plan's benefits, contrary to Section 1303's clear language.

IV.  **The Separate-Billing Rule Conflicts with Section 1303's Provisions Regarding Consumer Notice of Abortion Coverage.**

HHS adopted the Separate-Billing Rule to interpret Section 1303(b)(2), the separate-accounting requirement that mandates that issuers collect from enrollees "separate payment[s]" for the abortion-related portion of their premiums. The rule is at odds, however, with Section 1303(b)(3), a separate subsection of the ACA that sets out detailed "[r]ules relating to notice" of a plan's abortion coverage. Under those rules, an exchange plan providing non-Hyde abortion coverage "shall provide a notice to enrollees, *only* as part of the summary of benefits and coverage explanation, at the time of enrollment, of such coverage." 42 U.S.C. § 18023(b)(3)(A) (emphasis added). That notice, along with "any advertising used by the issuer with respect to the plan, any

information provided by the Exchange, and any other information specified by" HHS "shall provide information *only* with respect to the total amount of the combined payments for [non-Hyde abortion services] and other services covered by the plan." *Id.* § 18023(b)(3)(B) (emphasis added).

Section 1303(b)(3) thus constrains the extent to which HHS may compel issuers to tell consumers about a plan's inclusion of abortion coverage and the cost of that coverage. Specifically, it forbids HHS from mandating such notice about the cost of non-Hyde abortion coverage, either at the time of enrollment (when consumers make initial payments to secure coverage) or through subsequent billing correspondence. Because the Separate-Billing Rule directly contravenes Section 1303's notice requirements and limitations, it was beyond HHS's authority to adopt and is contrary to law under the APA, 5 U.S.C. § 706(2).

Although HHS attempted to address this conflict in the Separate-Billing Rule, its rationale is illogical. In HHS's telling, the rule is "primarily" a means of ensuring that issuers collect separate payments for abortion-related coverage and "any insight the policy holder gains from the separate bill . . . about the [plan's] coverage of non-Hyde abortion services is incidental" to that primary purpose. 84 Fed. Reg. at 71,693. HHS asserts that the rule is therefore consistent with Section 1303's notice rules. However, a regulation that expressly requires a regulated party to do something that a statute forbids cannot be saved by reciting its asserted regulatory purpose. In any event, HHS's description of the Final Rule's consumer-notice function as "incidental" is belied by other portions of the rule. In adopting the Separate-Billing Rule, HHS repeatedly asserted that consumers could use the separate monthly bills "to decide whether to remain enrolled in" a plan covering abortion "or seek a [plan] without such coverage." *Id.* at 71,695; *see also, e.g.*, *id.* at 71,694. In fact, HHS identified increased consumer transparency as one of only two (both unquantifiable) "benefits" from the Separate-Billing Rule. *Id.* at 71,691. HHS cannot reconcile the

Separate-Billing Rule with Section 1303 based on a rationale contradicted by the rule itself. *See, e.g.*, *ANR Storage Co. v. Fed. Energy Regulatory Comm'n*, 904 F.3d 1020, 1028 (D.C. Cir. 2018) (holding agency decision was "internally inconsistent" and therefore arbitrary and capricious).

## V.    HHS Adopted The Separate-Billing Rule's Opt-Out Policy Without Notice and an Opportunity for Public Comment.

Agency rules are generally subject to the APA's notice-and-comment rulemaking requirements, 5 U.S.C. § 553. Consistent with these requirements, an agency must follow "a three-step process—issuance of a notice of proposed rulemaking, followed by receipt and consideration of comments on the proposal, followed by promulgation of a final rule that incorporates a statement of basis and purpose." *Ohio River Valley Envtl. Coal., Inc.*, 473 F.3d at 102.

The Opt-Out Policy constitutes the kind of substantive "rule," 5 U.S.C. § 551(4), to which the APA's notice-and-comment rulemaking requirements apply because it establishes "a binding norm" that leaves agency officials unable to "exercise their discretion." *Casa De Maryland v. U.S. Dep't of Homeland Sec.*, 924 F.3d 684, 702 (4th Cir. 2019), *pet. for cert. filed*, 2019 WL 2267223 (U.S. May 24, 2019) (No. 18-1469) (citing *Chen Zhou Chai v. Carroll*, 48 F.3d 1331, 1341 (4th Cir. 1995)). The Opt-Out Policy was not, however, mentioned in the Proposed Rule, and HHS thus did not seek public comment on it. Because the Opt-Out Policy far exceeds the scope of what HHS indicated it was considering in the Proposed Rule, and interested parties could not reasonably have foreseen that HHS would expand the scope of the rule in this way, the Opt-Out Policy is not a "logical outgrowth" of the Proposed Rule. *Am. Paper Inst. v. U.S. EPA*, 660 F.2d 954, 960 n.13 (4th Cir. 1981).

Had interested parties known that HHS was considering this option, they would have made clear to HHS that the Opt-Out Policy is at odds with Section 1303's plain language, which requires a plan that covers abortion care to "collect from each enrollee" the portion of the premium

attributable to non-Hyde abortion care. *See supra* pp. 34–35. They also would have explained that the Opt-Out Policy is fundamentally irrational and inconsistent with Section 1303's purpose. *See supra* p. 31. Because HHS did not provide the public with notice of the policy and an opportunity to comment before its adoption, the Final Rule should be held unlawful and set aside.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court (1) enter summary judgment in their favor, (2) declare the Final Rule invalid under the APA, and (3) immediately set aside the Final Rule by vacating it to prevent its enforcement. 5 U.S.C. § 706; *see also, e.g.*, *Sierra Club*, 899 F.3d at 295 (ordering immediate vacatur in an APA case).

Respectfully submitted,

| | |
|---|---|
| /s/ Andrew D. Freeman | /s/ Julie A. Murray |
| (signed by Julie A. Murray with | Julie A. Murray, Bar No. 812442* |
| permission of Andrew D. Freeman) | Carrie Y. Flaxman, Bar No. 812450* |
| Andrew D. Freeman, Bar No. 03867 | Planned Parenthood Federation of America |
| Monica R. Basche, Bar No. 20476 | 1110 Vermont Avenue, NW, Suite 300 |
| Brown, Goldstein & Levy, LLP | Washington, DC 20005 |
| 120 E. Baltimore Street, Suite 1700 | Phone: (202) 803-4045 |
| Baltimore, MD 21202 | julie.murray@ppfa.org |
| Phone: (410) 962-1030 | carrie.flaxman@ppfa.org |
| Fax: (410) 385-0869 | |
| adf@browngold.com | *Attorneys for Plaintiff Planned Parenthood* |
| mbasche@browngold.com | *of Maryland, Inc.* |

*Attorneys for Plaintiffs*

Andrew Beck, Bar No. 812465*
Meagan Burrows, Bar No. 812449*
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Phone: (212) 549-2633
Fax: (212) 549-2652
abeck@aclu.org
mburrows@aclu.org

*Attorneys for Plaintiffs Hambrick,*
 * Admitted pro hac vice          *Barson, DiDato and Hollander*

Dated: March 2, 2020