**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| Planned Parenthood of Maryland, Inc., *et al.* | * | |
| v. | * | Civil No. CCB-20-00361 |
| Alex M. Azar II, Secretary of the United States of Health and Human Services, in his official capacity, *et al.* | * | |
| | * | |

**MEMORANDUM**

The plaintiffs, Planned Parenthood of Maryland, Inc., and individuals Kirsty Hambrick, Rebecca Parson, Mariel Didato, and Tanja Hollander on behalf of themselves and a proposed class, challenge the promulgation of a rule interpreting Section 1303 of the Patient Protection and Affordable Care Act ("ACA"). The defendants are Alex M. Azar II, in his official capacity; the U.S. Department of Health and Human Services ("HHS"); Seema Verma, Administrator of the Centers for Medicare and Medicaid Services, in her official capacity; and Centers for Medicare and Medicaid Services (collectively, "HHS" or "defendants"). Now pending are the plaintiffs' motion for summary judgment (ECF 29; ECF 41[1]); the defendants' motion for summary judgment (ECF 35); the plaintiffs' motion for leave to file an amended complaint (ECF 39); and the plaintiffs' motion for class certification (ECF 40). The motions have been fully briefed and no oral argument is needed. The motion for leave to file an amended complaint, which has not been opposed, will be granted. For the reasons stated below, the motion for class certification will be granted, the plaintiffs' motion for summary judgment will be granted, and the defendants' motion for summary judgment will be denied.

---

[1] The plaintiffs filed a second version of their motion for summary judgment, which is the same as the first version filed, except it contains cites to the official administrative record.

## FACTS AND PROCEDURAL HISTORY

This case concerns HHS's promulgation of a rule regarding the requirement of "separate payment" in Section 1303 of the ACA, which is codified at 42 U.S.C. § 18023.  Section 1303 allows qualified health plans ("QHPs") offered through state exchanges to decide whether or not to provide coverage for abortion services, subject to state laws prohibiting or requiring such coverage.  *Id.* (a), (b)(1)(A).  But Section 1303 also prohibits federal funding of certain abortion services.  Specifically, it prohibits the QHP issuer from using federal credits or federal cost-sharing reductions to pay for "non-Hyde abortions," which are abortion services for which public funding is prohibited under the Hyde Amendment.[2]  To that end, QHP issuers that provide coverage for non-Hyde abortions must:

> (i) collect from each enrollee in the plan (without regard to the enrollee's age, sex, or family status) a separate payment for each of the following:
>
>> (I) an amount equal to the portion of the premium to be paid directly by the enrollee for coverage under the plan of services other than services described in paragraph (1)(B)(i)[3] (after reduction for credits and cost-sharing reductions described in subparagraph (A)); and
>>
>> (II) an amount equal to the actuarial value of the coverage of services described in paragraph (1)(B)(i), and
>
> (ii) shall deposit all such separate payments into separate allocation accounts as provided in subparagraph (C).

42 U.S.C. § 18023(b)(2)(B).  In 2012, HHS promulgated a regulation interpreting Section 1303 at 45 C.F.R. § 156.280, which largely repeated the language of the statute.  HHS issued guidance in 2015, which provided that "section 1303 of the Affordable Care Act and § 156.280 do not specify the method an issuer must use to comply with the separate payment requirement" and

---

[2] The current version of the Hyde Amendment, in Department of Labor, Health and Human Services, and Education, and Related Agencies Appropriations Act, Pub. L. No. 115-245, div. B, tit. V, §§ 506–507 (2019), prohibits the appropriated federal funds from being expended for any abortion except where the pregnancy is a result of a rape or incest, or threatens the life of the pregnant person.

[3] Subsection (1)(B)(i) describes "[a]bortions for which public funding is prohibited."  42 U.S.C. § 18023(b)(1)(B)(i).

noted that the provision could be satisfied by, *inter alia*, "[s]ending the enrollee a single monthly invoice or bill that separately itemizes the premium amount for non-excepted abortion services; sending a separate monthly bill for these services; or sending the enrollee a notice at or soon after the time of enrollment that the monthly invoice or bill will include a separate charge for such services and specify the charge."  Patient Protection and Affordable Care Act; HHS Notice of Benefit and Payment Parameters for 2016, 80 FR 10750-01, 10840 (Feb. 27, 2015).

On November 9, 2018, HHS proposed the rule challenged here.  *See* Patient Protection and Affordable Care Act; Exchange Program Integrity, 83 FR 56015 (Nov. 9, 2018) (proposed rule).  HHS proposed that issuers would need to send two separate bills to the policyholder to comply with § 1303 (one bill for the portion of the premium attributable to non-Hyde abortion coverage and one for the rest of the premium), and instruct the policyholder to pay the premium attributable to non-Hyde abortion coverage in a separate transaction.  *Id.* at 56022–23.  HHS stated that this rule would better align with "Congressional intent that the QHP issuer bill separately for two distinct (that is, 'separate') payments, one for the non-Hyde abortion services, and one for all other services covered under the policy."  *Id.* at 56022.  The proposed rule stated, though, that for enrollees who still pay the entire premium in one transaction, "the QHP issuer would not be permitted to refuse to accept such a combined payment on the basis that the policy subscriber did not send two checks as requested by the QHP issuer, and to then terminate the policy, subject to any applicable grace period, for non-payment of premiums."  *Id.* at 56023.

HHS received many objections to the proposed changes.  Patient Protection and Affordable Care Act; Exchange Program Integrity, 84 FR 71674, 71684 (final rule).  Among the concerns were that it was an unnecessary change which would not enhance program integrity; that it would be against industry practice, which permits a single bill outlining charges; that it

would make it more difficult for policy holders to pay their premiums, as enrollees would not understand the second bill; that it could result in coverage being unintentionally terminated for failure to pay premiums; and that the requirement that issuers repeatedly instruct enrollees to send separate payments but also accept payments that are not separate would lead to confusion and increase the burden on issuers. *Id.* at 71684–85. Commenters also stated that HHS underestimated the costs of the proposed rule to issuers, as they would incur substantial operational and administrative costs in issuing separate bills. *Id.* at 71687. Exchanges, also, would need to make resource intensive changes to their websites, enrollment systems, and customer services. *Id.* As to enrollees, commenters argued that the rule could result in higher premiums (to account for the increased costs for issuers) and in QHP's dropping non-Hyde abortion coverage if the separate-billing requirement proves too burdensome. *Id.* Commenters also stated that the effective date was too soon and would not give issuers enough time to change their billing structure, especially since the effective date would be in the middle of a plan year. *Id.* at 71689.

On the other hand, "[a] minority of commenters summarily supported the policy." *Id.* at 71684. Some commenters stated that the new rule would promote compliance with the segregation of funds requirement and the requirement to collect separate payments, and supported the protections for enrollees if they sent back one combined payment. *Id.*

The final rule, published on December 27, 2019, largely adopted the proposed rule. HHS reasoned that, although Section 1303 does "not specify the method a QHP issuer must use to comply with the separate payment requirement," *id.* at 71683, "we continue to believe that the statute contemplates issuers billing separately for coverage of non-Hyde abortion services, consistent with Congress's intent that issuers collect separate payments for such services," *id.* at

71685.  In response to the concerns expressed in the notice and comment period, however, HHS changed the requirement that the bills be sent in separate mailings with separate postage, although bills sent electronically must still be sent through separate communications.  *Id.*

The final rule contains some protections for enrollees who either continue to combine the two payments, or fail to make the separate payment for non-Hyde abortion coverage.  The rule provides that a QHP issuer cannot terminate coverage if the enrollee pays the premium in a single payment, but "QHP issuers should make reasonable efforts to collect the payment separately."  *Id.*  HHS stated it would not take enforcement action against issuers that decline to put enrollees in a grace period or terminate coverage if the enrollee fails to make the separate payment for non-Hyde abortion coverage.  *Id.* at 71686.  The final rule also stated that, until HHS is able to address certain concerns through future action, "we also will not take enforcement action against QHP issuers that modify the benefits of a plan either at the time of enrollment or during a plan year to effectively allow enrollees to opt out of coverage of non-Hyde abortion services by not paying the separate bill for such services."  *Id.*  This would result in a modified plan that does not cover non-Hyde abortion services with no obligation to pay the premium for such services, although the ability for issuers to do this is subject to state law.  *Id.* The plaintiffs refer to this as the "Opt-Out Policy."

HHS stated that the final rule would cost over $1 billion between 2020 and 2024.  *Id.* at 71707.  In response to concerns about the substantial costs of the rule to issuers, exchanges, and enrollees, HHS stated that this use of resources "is important to achieving better alignment of the regulatory requirements for QHP issuer billing of enrollee premiums with the separate payment requirement in section 1303 of the PPACA."  *Id.* at 71688.

The final rule sets the implementation deadline as 60 days after the publication of the rule in the Federal Register, *id.* at 71687, but due to the COVID-19 pandemic, the effective date has been delayed by 60 days, to August 26, 2020. *See* Medicare and Medicaid Programs, Basic Health Program, and Exchanges; Additional Policy and Regulatory Revisions in Response to the COVID-19 Public Health Emergency and Delay of Certain Reporting Requirements for the Skilled Nursing Facility Quality Reporting Program, 85 FR 27550, 27599 (interim final rule).  In the final rule, HHS noted that, because the current practice "has contributed to unknowing purchases of QHPs that include coverage of non-Hyde abortion services by consumers who object to purchasing such coverage," it was important to start enforcing the rule as soon as possible.  Final Rule, 84 FR at 71687.  HHS also announced it would exercise enforcement discretion as to issuers who fail to timely comply with the rule but are acting in good faith, *id.* at 71689–90, but will not exercise such discretion "after more than 1 year following publication of the [final rule] or more than 6 months after the end of the COVID-19 [public health emergency], whichever comes later."  Interim Final Rule, 85 FR at 27600.

The plaintiffs are Planned Parenthood Maryland ("PPM"), a nonprofit reproductive healthcare provider, and several individuals who purchased exchange-based health insurance that covers non-Hyde abortion care.  The plaintiffs filed their complaint on February 11, 2020, (ECF 1), and a motion for leave to file an amended complaint on May 19, 2020, (ECF 39), which added class allegations.  The plaintiffs bring three counts: 1) Violation of the Administrative Procedure Act ("APA") – Contrary to Law and in Excess of Statutory Authority; 2) Violation of the APA – Arbitrary and Capricious; and 3) Violation of the APA – Failure to Observe Procedure Required by Law.  They request that the court "(A) Certify a class . . . pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(2); (B) Declare that Defendants have violated

the APA by adopting the Final Rule using a rationale that is arbitrary, capricious, and otherwise

contrary to law, and by failing to notify the public and afford it an opportunity to comment

before adopting the Final Rule; (C) Declare unlawful and immediately vacate the Final Rule; (D)

Issue permanent, and if necessary preliminary, injunctive relief without bond that prevents the

Defendants from requiring implementation of the Final Rule; (E) Award Plaintiffs their costs and

expenses, including reasonable attorneys' fees; and (F) Grant such other relief as this Court

deems just and proper." (Am. Compl. at 37).

## MOTION FOR CLASS CERTIFICATION

### I.       Standard of Review

Federal Rule of Civil Procedure 23(a) sets out the following requirements to certify a class:

> (1) the class is so numerous that joinder of all members is impracticable;
> (2) there are questions of law or fact common to the class;
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  In addition to satisfying the Rule 23(a) criteria, the plaintiffs must also

show that the proposed class meets one of the criteria in Rule 23(b), regarding allowable types of

class actions.  Here, the plaintiffs state that the class meets the criteria of Rule 23(b)(2), in which

"the party opposing the class has acted or refused to act on grounds that apply generally to the

class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting

the class as a whole[.]"  "It is the plaintiffs' burden to demonstrate compliance with Rule 23, but

the district court has an independent obligation to perform a 'rigorous analysis' to ensure that all

of the prerequisites have been satisfied."  *EQT Prod. Co. v. Adair*, 764 F.3d 347, 358 (4th Cir.

2014).

### II.      Discussion

The "consumer plaintiffs" (Kirsty Hambrick, Rebecca Barson, Mariel DiDato, and Tanja Hollander)[4] move to certify a class under Federal Rule of Civil Procedure 23(b)(2).  The proposed class is defined as:

> all enrollees in individual-market Affordable Care Act ("ACA") exchange plans whose plans: (1) include coverage of abortion services for which federal funds appropriated to the Department of Health and Human Services ("HHS") may not be used; and (2) are subject to the Separate-Billing Rule's segregation and separate billing requirements, exclusive of any enrollees who have "opted out" of abortion coverage in such plans, pursuant to the Separate-Billing Rule's opt-out policy.

The defendants oppose the motion for class certification.  They argue that the proposed class is not ascertainable; the proposed class does not meet the requirements of typicality and commonality with respect to the opt-out policy; and the proposed class is overbroad.[5]

a.  Ascertainability

The defendants argue that the proposed class is not ascertainable, because it is not administratively feasible to determine who has opted out of non-Hyde abortion coverage pursuant to the rule's "opt-out policy."  According to the defendants, it is not clear what issuers will even allow opt outs or how many people will choose to opt out, and any records as to who opts out will be maintained by issuers, who are not parties to this action.  Further, issuers may vary in the manner in which they determine who has opted out, and deciding whether an individual has in fact opted out will require the court to make factual determinations.  The

---

[4] Plaintiff PPM does not so move because it is not a member of the proposed class.

[5] The defendants also argue that the court should decide the class certification question before proceeding to the merits of the summary judgment motions, to avoid the unfairness of one-way intervention, which is when "members of a class [] benefit from a favorable judgment without subjecting themselves to the binding effect of an unfavorable one."  *Am. Pipe & Const. Co. v. Utah*, 414 U.S. 538, 547 (1974).  But, even assuming that such a rule applies to a 23(b)(2) class, it is not implicated here, because this opinion addresses both the motion for class certification and the motions for summary judgment.  *See Costello v. BeavEx, Inc.*, 810 F.3d 1045, 1058 (7th Cir. 2016) (rule against one-way intervention not violated when "[i]n one order, the district court first denied class certification and then granted Plaintiffs' motion for partial summary judgment").

plaintiffs argue that ascertainability is not a requirement for Rule 23(b)(2) class actions and, regardless, the class is ascertainable.[6]

Regardless of whether ascertainability is a requirement, the court agrees with the plaintiffs that the proposed class is ascertainable.  "The goal [of ascertainability] is not to identify every class member at the time of certification, but to define a class in such a way as to ensure that there will be some administratively feasible way for the court to determine whether a particular individual is a member at some point."  *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 658 (4th Cir. 2019) (internal quotation marks, citations, and alteration omitted).  Here, it is administratively feasible to determine who has opted out, because if there is any dispute, the court may look to the issuer's records.[7]  When a policy holder opts out of non-Hyde abortion coverage, the plan is modified; the policy holder no longer pays the non-Hyde abortion premium, and no longer receives non-Hyde abortion coverage.  Final Rule, 84 FR at 71687.  Because the plan is modified, issuers who allow for opt-outs must keep track of who has opted out, so that the issuer knows the scope of that individual's insurance policy, and how much to charge the individual in premiums.

This is unlike the situation in *EQT Production Co.*, 764 F.3d 347, to which the defendants cite.  There, the Fourth Circuit remanded the case for the district court to consider whether the proposed class – "persons who have never received [coalbed methane gas "CBM"] royalties for a CBM interest they claim to own" – was ascertainable.  *Id.* at 355, 360.  The

---

[6] The Fourth Circuit has "repeatedly recognized that Rule 23 contains an implicit threshold requirement that the members of a proposed class be 'readily identifiable.'"  *EQT Prod. Co. v. Adair*, 764 F.3d at 358 (citation omitted). The parties dispute whether this also applies to Rule 23(b)(2) classes.  Because the court finds that the proposed class is ascertainable, it need not reach this question.

[7] According to the plaintiffs, "the Separate-Billing Rule requires regulated entities to create and maintain records identifying enrollees who have 'opted out' of abortion coverage for purposes of future billing and compliance with the Rule." (ECF 54, Reply at 6).  It does not appear that the "separate billing" rule specifically requires issuers to keep records of those who opted out of abortion coverage.  Nonetheless, the court agrees with the plaintiffs that an issuer allowing opt-outs must in practice keep records, because opting out changes both the policy holder's obligation to pay the non-Hyde abortion premium, and also the coverage of the policy.

district court had stated that ownership schedules listing all potential interest holders could be relied upon, but the Fourth Circuit noted that some of the ownership schedules were outdated and did not reflect changes in ownership, such that ownership would have to be resolved based on land records, "a complicated and individualized process." *Id.* at 353, 359.[8] Here, there is no need for a "complicated and individualized" process to determine who has opted out, because the court can consult the issuers' records. And there is no reason to believe that issuer records of who has opted out are (or will be) outdated, particularly as those records are necessary to determine the scope of the individual's insurance policy.

That the records of opt-outs are held by multiple issuers does not make the class action administratively infeasible. Because this is a Rule 23(b)(2) action, notice is not required, and the requested relief (vacatur of the rule and a declaration of its invalidity) will be the same for all class members. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 362 (2011) ("The Rule provides no opportunity for (b)(1) or (b)(2) class members to opt out, and does not even oblige the District Court to afford them notice of the action.").[9] It is possible that the court might at some point need to decide whether a specific individual is a class member and bound by the court's judgment or has the power to enforce non-compliance with the judgment. In these situations, if they occur, whether that person has opted out can be readily determined by looking at the issuer's records or the individual's insurance policy. And the court may rely on such records even if they are maintained by non-party issuers. *Romig v. Pella Corp.*, No. 2:14-CV-

---

[8] *EQT* also held that, "[l]acking even a rough outline of the classes' size and composition, we cannot conclude that they are sufficiently ascertainable." *Id.* at 360. Here, the general size of the class is known, as HHS stated in the final rule that "we estimate that there are approximately 3.04 million enrollees impacted by these provisions." Final Rule, 84 FR at 71706. It is not clear if any issuer has implemented the "separate billing" requirement yet, and, if so, whether that issuer offers an opt-out policy and whether any policy holder has opted out.

[9] The members of the class do not seek any monetary damages, thus lessening the likelihood that it will be necessary to engage in any individualized assessment of the precise membership.

00433-DCN, 2016 WL 3125472, at *4 (D.S.C. June 3, 2016)[10] (problems in locating certain class members can be mitigated by use of third party records).

Finally, although an issuer must make factual determinations to decide whether a policy holder intends to opt-out, the court need not.  This is because whether the policy holder has *in fact* opted out is determined by the issuer and will presumably be documented in the issuer's records.  There is no need for "extensive and individualized fact-finding or 'mini-trials'" to determine who has opted out.  *EQT Prod. Co.*, 764 at 358.  Rather, the court need only look to the issuer's records regarding the policy holder.

b.  Commonality and Typicality

"Commonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury'" and that their claims involve a common contention, the determination of which "will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 564 U.S. at 349–50 (citation omitted).  The plaintiffs must also show that their claims are typical of the class claims.  *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157–58 (1982). Typicality does not require "that the plaintiff's claim and the claims of class members be perfectly identical or perfectly aligned" but the "plaintiff's claim cannot be so different from the claims of absent class members that their claims will not be advanced by plaintiff's proof of his own individual claim."  *Deiter v. Microsoft Corp.*, 436 F.3d 461, 466–67 (4th Cir. 2006).  "The commonality and typicality requirements of Rule 23(a) tend to merge.  Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Falcon*, 457 U.S. at 157 n.13.

---

[10] Unreported cases are cited for the soundness of their reasoning, not for any precedential value.

The defendants argue that the named consumer plaintiffs cannot show any harm from the opt-out policy, and thus cannot show that they have suffered the same harm as absent class members.  The defendants also argue that it is not clear which states will permit issuers to offer an opt-out policy, and if the states allow it, whether the issuers will in fact offer policy holders this option.  Therefore, according to the defendants, it is not clear whether the plaintiffs' harm from the opt-out policy will be typical of the other class members.

The opt-out policy is just one small part of the final rule that the plaintiffs challenge.  The crux of the rule is the "separate billing" requirement and the plaintiffs' main contention is that the rule is unlawful.  Whether the rule is unlawful is a common question that "will resolve an issue that is central to the validity of each one of the claims in one stroke."  And the named consumer plaintiffs are typical of the rest of the class because the named consumer plaintiffs as well as the class members are individuals who are subject to the "separate billing" requirement, will now receive separate bills under the rule, are in danger of losing their insurance coverage if they do not pay the separate bills, and are in danger of losing non-Hyde abortion coverage if states allow issuers to drop the coverage and if issuers decide that the "separate billing" rule is too burdensome.  That there may be a slight difference in how the rule affects members of the class — based on whether issuers offer an opt-out policy — does not defeat commonality and typicality.

But in any event, the plaintiffs have shown typicality and commonality with respect to the opt-out policy.  Three of the four plaintiffs live in states where abortion coverage is permitted but not required,[11] and these are the states in which issuers are most likely to offer opt-outs.  The

---

[11] Three of the plaintiffs are from Maryland, Washington D.C., and New Jersey.  (*See* Am. Compl. ¶¶ 15–17).  These states permit but do not require non-Hyde abortion coverage in ACA marketplace plans.  "Interactive: How State Policies Shape Access to Abortion Coverage," Kaiser Family Foundation, https://www.kff.org/womens-health-policy/issue-brief/interactive-how-state-policies-shape-access-to-abortion-coverage/ (published February 10, 2020).

named plaintiffs do not intend to opt-out of non-Hyde abortion coverage. (*See* ECF 29-3 ¶ 4; 29-4 ¶ 4, 29-5 ¶ 4, Declarations). Finally, where issuers offer an opt-out policy, those who do not opt out will likely face increased premiums for non-Hyde abortion services, to make up for the fact that the opt-outs will no longer pay such premiums. Therefore, the named plaintiffs are likely to experience harm from the opt-out policy, and that harm is likely to be typical of the rest of the class who are also affected by the opt-out policy.

   c.   Overbreadth

   The defendants argue that even if the plaintiffs satisfy the requirements of Rule 23, the class should still exclude members who reside in certain states which have challenged the rule in a separate case in the Northern District of California, *California v. Azar*, No. 3:20-cv-00682-LB (N.D. Cal.).[12] The defendants argue that relief granted by this court as to those states would be duplicative of the relief requested in the California case, and would render a government victory in that case meaningless.

   A nationwide class is not "inconsistent with principles of equity jurisprudence, since the scope of injunctive relief is dictated by the extent of the violation established, not by the geographical extent of the plaintiff class." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). But "a federal court when asked to certify a nationwide class should take care to ensure that nationwide relief is indeed appropriate in the case before it, and that certification of such a class would not improperly interfere with the litigation of similar issues in other judicial districts." *Id.* Although there is pending litigation in California, the plaintiffs — States through their

---

[12] The states challenging the "separate billing" rule in the California action are California, New York, Maine, Maryland, Oregon, and Vermont, as well as D.C. (3:20-cv-00682-LB, ECF 1). Additionally, the district court for the Eastern District of Washington has declared the rule invalid and without force in Washington, on state law grounds. *Washington v. Azar*, 2:20-cv-00047-SAB, ECF No. 17 (Apr. 9, 2020), appeal docketed, No. 20-35521 (9th Cir. June 10, 2020). To the extent the defendants argue that extending relief to class members in Washington would be inappropriate, the court notes that the claims and plaintiffs differ in this case and the Washington case, and it is not clear why such relief, even if duplicative, would be improper.

Attorneys-General — are different, and it does not appear that a decision granting the plaintiffs the relief they request in this case will prevent the California case from proceeding on the merits. The court understands the government's concern that class-wide relief in this case may render a government victory in that case largely meaningless, but the court is also concerned about excluding members from a class simply because the state they reside in is a plaintiff in a related action.

The defendants cite to *Fisher v. Rite Aid Corp.*, No. CIV.A.RDB-09-1909, 2010 WL 2332101, at *2 (D. Md. June 8, 2010), in which the court dismissed the case, under the first-to-file rule, in favor of the first filed case in another forum. But *Fisher* and the first filed case not only involved substantially similar issues and the same defendants, but the named plaintiff in *Fisher* was also a party-plaintiff in the other action, and in both cases "each class [was] similarly defined to include current and former assistant managers of Rite Aid." *Id.* In contrast to *Fisher*, the named plaintiffs (or any class plaintiffs) are not parties to the California action or any other action (that the court is aware of) challenging the "separate billing" rule.

d.   Other Factors

Although the defendants do not challenge numerosity, fair and adequate representation, or whether the class meets the requirements of Rule 23(b)(2), the court has an independent obligation to ensure that these prerequisites are met. The proposed class meets the numerosity requirement, because, with approximately 3 million class members, *see* Final Rule, 84 FR at 71706, spread throughout the country, joinder of all members is impracticable. *See* Rule 23(a)(1). "Representation is adequate if: (1) the named plaintiffs' interests are not opposed to those of other class members, and (2) the plaintiffs' attorneys are qualified, experienced and able to conduct the litigation." *Cuthie v. Fleet Reserve Ass'n*, 743 F. Supp. 2d 486, 499 (D. Md.

2010).  There does not appear to be any conflict between the named plaintiffs and the other class members, and counsel is qualified and experienced.  (*See* ECF 40-2, Andrew D. Freeman Decl.; ECF 40-3, Megan M. Burrows Decl.; ECF 40-4, Kirsty Hambrick Decl; ECF 40-5, Rebecca Barson Decl.; ECF 40-6, Mariel Didato Decl.; ECF 40-7, Tanja Hollander Decl.).  Finally, Rule 23(b)(2) is met because the "separate billing" rule applies generally to the class, and the requested relief — declaring the rule invalid and preventing the defendants from requiring its implementation — "would provide the same relief to all class members."  *Healthy Futures of Texas v. Dep't of Health & Human Servs.*, 326 F.R.D. 1, 8 (D.D.C. 2018).

Accordingly, the court will grant the plaintiffs' motion for class certification.

## MOTIONS FOR SUMMARY JUDGMENT

### I.    Standard of Review

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no *genuine* dispute as to any *material* fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a) (emphases added).  "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'"  *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)).  "A fact is material if it 'might affect the outcome of the suit under the governing law.'"  *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]"  *Anderson*, 477 U.S. at 247–48.  The court must view the evidence in the light most favorable to the nonmoving party, *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (per curiam) (citation and quotation omitted), and draw all reasonable inferences in that party's favor, *Scott v. Harris*, 550

U.S. 372, 378 (2007) (citations omitted); *see also Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568–69 (4th Cir. 2015).  At the same time, the court must "prevent factually unsupported claims and defenses from proceeding to trial."  *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993)).

## II.   Discussion

### a.   Administrative Procedure Act

The Administrative Procedure Act ("APA") provides the standard for reviewing an agency's promulgation of a rule.  Under the APA, a court shall "hold unlawful and set aside agency action, findings, and conclusions found to be," *inter alia*, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]"  5 U.S.C. § 706(2)(A).  "The foregoing statutory criteria render [a court's] oversight 'highly deferential, with a presumption in favor of finding the agency action valid,' yet the arbitrary-and-capricious standard does not 'reduce judicial review to a rubber stamp of agency action.'"  *Friends of Back Bay v. U.S. Army Corps of Engineers*, 681 F.3d 581, 587 (4th Cir. 2012) (citation omitted).

"To comply with § 706(2)(A), an agency 'must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'"  *Casa De Maryland*, 924 F.3d 684, 703 (4th Cir. 2019) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  In changing previous policies, the agency must provide a "reasoned explanation for the change."  *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125  (2016).  The agency must "display awareness that it is changing position," "show that there are good reasons for the new policy," and address serious reliance interests.  *Id.* at 2126 (citation omitted).  "Normally, an agency rule

would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 43.

The parties disagree as to the application of *Chevron* and whether the court must afford the "separate billing" rule *Chevron* deference. *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.* generally provides that when reviewing an agency's interpretation of a statute, the court should defer to the agency's construction as long as 1) the statute is silent or ambiguous as to the specific issue and 2) the agency's construction is reasonable. 467 U.S. 837, 842–43 (1984). Although there is some overlap between the two, "'[a]rbitrary and capricious' review under the APA differs from *Chevron* step-two review because it focuses on the reasonability of the agency's decision-making processes rather than on the reasonability of its interpretation." *Native Angels Home Care Agency, Inc. v. Sebelius*, 749 F. Supp. 2d 370, 375 (E.D.N.C. 2010) (quoting *Tex. Office of Pub. Util. Counsel v. FCC*, 183 F.3d 393, 410 (5th Cir. 1999)). "Each test must be independently satisfied." *Mozilla Corp. v. Fed. Commc'ns Comm'n*, 940 F.3d 1, 49 (D.C. Cir. 2019). Therefore, even if the "separate billing" requirement is a reasonable interpretation and entitled to *Chevron* deference, the court must still independently analyze whether it violates the APA. *See id.* (regulation permissible interpretation under *Chevron* yet arbitrary and capricious under the APA because the agency did not consider an important factor).

b.   Contrary to Section 1554 of the ACA

The plaintiffs argue that the "separate billing" rule violates Section 1554 of the ACA. Section 1554 provides that:

> Notwithstanding any other provision of this Act, the Secretary of Health and
> Human Services shall not promulgate any regulation that--
> (1) creates any unreasonable barriers to the ability of individuals to obtain
> appropriate medical care;
> (2) impedes timely access to health care services;
> (3) interferes with communications regarding a full range of treatment options
> between the patient and the provider;
> (4) restricts the ability of health care providers to provide full disclosure of all
> relevant information to patients making health care decisions;
> (5) violates the principles of informed consent and the ethical standards of health
> care professionals; or
> (6) limits the availability of health care treatment for the full duration of a
> patient's medical needs.

42 U.S.C. § 18114.  The plaintiffs note that Congress specifically defined "medical care"

to include "amounts paid for insurance covering" such care.  42 U.S.C. § 300gg-91(a)(2).  They

argue that as the separate billing requirement creates a barrier to paying for insurance, it creates a

barrier to medical care.  Additionally, the plaintiffs argue that the effects of the rule (e.g. lost

coverage, fewer issuers offering abortion coverage, higher premiums) will impede timely access

to health services and limit the availability of health care treatment.

HHS argues that Section 1554 only bars direct interference with healthcare, relying on

the Ninth Circuit's opinion in *California by & through Becerra v. Azar*, 950 F.3d 1067 (9th Cir.

2020) (en banc).  *Becerra* involved a challenge to HHS's regulations under Title X of the Public

Health Services Act, restricting Title X grantees from making referrals for abortion services, and

increasing the degree of physical separation needed between Title X activities and abortion

services.  *Id.* at 1081–82.  The Ninth Circuit interpreted Section 1554 narrowly, to prohibit only

"direct interference with certain health care activities" and not "directives that ensure

government funds are not spent for an unauthorized purpose."  *Becerra*, 950 F.3d at 1094.  HHS

also argues that under the plaintiffs' reading of Section 1554, "HHS would be barred from

adopting essentially *any* regulation that could even *potentially* raise health care costs or

indirectly lead to a reduction in coverage, no matter how speculative the chain of contingencies[.]"  (ECF 35-1, HHS's Mot. at 20).

The court agrees with the plaintiffs that the "separate billing" rule violates subsection (1) of Section 1554.  The "separate billing" requirement directly affects how consumers pay for medical care.  And it is a "barrier" because it makes it harder for consumers to pay for insurance, because they must now keep track of two separate bills.  Further, on the record before it, the court finds that the "separate billing" requirement is an "unreasonable barrier."[13]  The record indicates that the rule is likely to cause enrollee confusion and may lead to some enrollees losing health insurance, should issuers choose not to take advantage of HHS's enforcement discretion policy regarding placing policy holders into grace periods.  *See* 84 FR at 71686; *see also* Blue Cross Blue Shield Association ("BCBSA") Comment at 3, Administrative Record ("AR") 080263 ("Failing to pay either premium would inevitably result in underpayment – leading to delinquency and possible termination of coverage.  Despite issuers' best attempts to communicate and educate, the reality is that consumers are often so inundated with required notices and mailings from a broad range of companies and industries that they frequently do not read everything issuers send.  A significant number of enrollees may opt not to pay a bill for $1 because of the hassle and cost of writing a check for that amount.").  HHS does not appear to dispute any of these assertions, instead stating that enrollee outreach, and some modifications to the rule (that bills can be put in the same envelope) will mitigate confusion.  84 FR at 71706.  But as HHS notes, there is a "[p]otential increase in out-of-pocket costs for enrollees who experience lapse in coverage for failing to make payments for coverage of non-Hyde abortion services due to confusion with [the] new billing system."  *Id.* at 7107.

---

[13]As to HHS's concern that this interpretation would bar any regulation that might possibly pose a barrier to the ability of individuals to obtain medical care, the court notes that Section 1554 prohibits only *unreasonable* barriers.

Even if enrollees are not confused, they will still have to spend extra time reading, understanding, and paying two separate bills each month (or arranging through autopay for the two bills to be paid).  *See id.* at 71706–07 (estimating costs to the approximately 2 million policy holders that will receive separate bills for reading and understanding the separate billing statements to be $35,517,268 for 2020 and $25,071,013 for each year from 2021–2024).  One of the commenters, America's Health Insurance Plans ("AHIP"), an association of insurers, noted that, based on insurers' prior experiences, enrollees are unlikely to understand the purpose of the separate bill, and "will be confused and aggravated by the additional burden of interpreting two invoices and making multiple payments."  AHIP Comment at 9, AR 80213.  Further, enrollees may spend time correcting billing issues if the second $1 payment is flagged by a bank or credit card as potentially fraudulent.  *Id.*  HHS does not appear to have addressed this potential payment issue.

On the other hand, HHS states that the rule will improve statutory alignment.  The explanation for the rule is that "[w]e believe Congress intended that QHP issuers collect two distinct (that is, 'separate') payments, one for the coverage of non-Hyde abortion services, and one for coverage of all other services covered under the policy, rather than simply itemizing these two components in a single bill, or notifying the enrollee that the monthly invoice or bill will include a separate charge for these services."  *Id.* at 71684.  But, HHS acknowledges in the rule that "Section 1303 of the PPACA . . . do[es] not specify the method a QHP issuer must use to comply with the separate payment requirement" and that the previous allowable billing methods "arguably identifies two 'separate' amounts for two separate purposes."  *Id.* at 71683, 71693.  Therefore, any purported benefit of statutory alignment appears to be minimal, as other

20

methods are permissible, and HHS acknowledges that Section 1303 does not specify a method of compliance.

*Becerra*, which the defendants cite to and was discussed above, is distinguishable for two reasons. First, *Becerra* involved a challenge to a regulation implementing Title X of the Public Health Service Act, a statute that precedes the ACA. Additionally, the challenged regulation was similar to a prior one the Supreme Court held was permissible in *Rust v. Sullivan*, 500 U.S. 173 (1991). The Ninth Circuit reasoned that "we may not lightly infer that Congress intended to overrule [the Supreme Court's holding in *Rust*] in enacting . . . § 1554 of the ACA." *Becerra*, 950 F.3d at 1085. Here, there is no need to find that Congress intended to overrule any prior law or Supreme Court holding, as the provision on which the "separate billing" rule is based is contained in the ACA, as is Section 1554.

Second, *Becerra* "distinguish[ed] between § 1554's prohibition on direct interference with certain health care activities and the Final Rule's directives that ensure government funds are not spent for an unauthorized purpose" in finding that the challenged regulation did not violate Section 1554, noting that "[t]he most natural reading of § 1554 is that Congress intended to ensure that HHS, in implementing the broad authority provided by the ACA, does not improperly impose regulatory burdens on doctors and patients." *Becerra*, 950 F.3d at 1094. The Ninth Circuit noted that a lack of physical separation, which the Title X regulation addressed, created some risk that Title X funds would be used for abortion services. *Id.* at 1098. Here, there is no contention that issuers are not properly segregating funds. The final rule does cite to a 2014 Government Accountability Office ("GAO") Report, which found that the Washington Health Benefit Exchange was not assessing a separate abortion premium for individuals whose premiums were fully subsidized. *See* U.S. Government Accountability Office, "Health Insurance

Exchanges: Coverage of Nonexcepted Abortion Services by Qualified Health Plans," at 7 n.12 (Sept. 15, 2014), available at http://www.gao.gov/products/GAO-14-742R.  But, in response to comments stating that the report was outdated, HHS expressly stated that it was not relying on the report and not basing the rule on ongoing compliance issues.  Final Rule, 84 FR at 71692 ("But regardless of whether there are ongoing compliance issues, the changes we are finaliz[ing] are primarily meant to" improve statutory alignment).  Rather than ensuring government funds are not spent on unauthorized purposes, this rule "improperly impose[s] regulatory burdens on . . . patients," *Becerra*, 950 F3d at 1094, because it will require them to keep track of and pay two separate bills each month.[14]

c.  Arbitrary and Capricious

1.  Explanation for the rule

"[A]n agency may justify its policy choice by explaining why that policy 'is more consistent with statutory language' than alternative policies[.]"  *Encino Motorcars,* 136 S. Ct. at 2127 (quoting *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 175 (2007))).  But a rule is arbitrary and capricious when the agency has failed to provide a minimum level of analysis so that its "path may reasonably be discerned."  *Id.* at 2125 (quoting *Bowman Transp., Inc. v. Arkansas–Best Freight System, Inc.*, 419 U.S. 281, 286 (1974)).

In *Encino Motorcars*, the Department of Labor ("DOL") promulgated a rule stating that service advisors (automotive dealership employees selling repair and maintenance services) were not exempt from the Fair Labor Standards Act's overtime and minimum wage provisions. *Encino Motorcars*, 136 S. Ct. at 2123.  In promulgating the rule, the DOL "abandon[ed] its decades-old practice of treating service advisors as exempt[.]"  *Id.*  But the only reasons for the

---

[14] Another judge in this district recently held, on a motion for preliminary injunction, that the Title X regulation (the same that was at issue in *Becerra*) likely violates § 1554.  *See Mayor & City Council of Baltimore v. Azar*, 392 F. Supp. 3d 602, 615 (D. Md. 2019).  The district court's grant of a preliminary injunction is currently on appeal.

new interpretation that DOL gave were that "the statute does not include such positions and the Department recognizes that there are circumstances under which the requirements for the exemption would not be met" and it "believes that this interpretation is reasonable" and "sets forth the appropriate approach." *Id.* at 2127 (quoting 76 FR 18838).  The court found that although "[a] summary discussion may suffice in other circumstances, [] here—in particular because of decades of industry reliance on the Department's prior policy—the explanation fell short of the agency's duty to explain why it deemed it necessary to overrule its previous position." *Id.* at 2126.

The plaintiffs argue that HHS has not sufficiently explained why the final rule is a better interpretation of the "separate payment" language in Section 1303; it is not based on any evidence of issuer non-compliance; and fails to reconcile the final rule with the ACA's purpose to increase health care coverage and reduce its cost.  HHS argues that Congress has mandated "separate payments" and therefore specified the means by which HHS should ensure that federal funds are not spent on non-Hyde abortions; HHS's view is entitled to deference; and whether there is evidence of issuer non-compliance or whether the rule furthers the overall purpose of the ACA is irrelevant.

The court agrees with the plaintiffs that HHS has not sufficiently provided good reasons for the "separate billing" requirement.  First, HHS's reasoning appears to be internally inconsistent and is not sufficiently explained.  In the final rule, HHS stated that "Section 1303 of the PPACA and current implementing regulations at § 156.280 do not specify the method a QHP issuer must use to comply with the separate payment requirement under section 1303(b)(2)(B)(i) of the PPACA and § 156.280(e)(2)(i)," and that methods such as itemizing the portions attributable to non-Hyde abortions "arguably identifies two 'separate' amounts."  Final Rule, 84

FR at 71683, 71693. It then pointed to the same "separate payment" language to find that "Congress intended that QHP issuers collect two distinct (that is, 'separate') payments, one for the coverage of non-Hyde abortion services, and one for coverage of all other services covered under the policy, rather than simply itemizing these two components in a single bill, or notifying the enrollee that the monthly invoice or bill will include a separate charge for these services." *Id.* at 71684. But if the "separate payment" language does not specify a method of compliance, it is not clear how HHS then determined that the same language reflects Congressional intent that issuers collect the payments in separate transactions. As in *Encino*, HHS has simply stated that it believes that the interpretation is reasonable and more appropriate, without explaining why.[15]

Second, HHS's explanation for the final rule is also inadequate because it failed to consider relevant factors in determining Congressional intent. It is true that "the plain language of the statute [] is the most reliable indicator of Congressional intent." *See Ojo v. Lynch*, 813 F.3d 533, 539 (4th Cir. 2016) (citation omitted). But "'the meaning—or ambiguity—of certain words or phrases may only become evident when placed in context.'" *Id.* at 539 (quoting *King v. Burwell*, 135 S. Ct. 2480, 2489 (2015)). This is especially relevant here because HHS appears to acknowledge that the plain language does not require the "separate billing" rule. But in determining Congressional intent, HHS did not consider relevant context, including the "separate payment" language's place in the statutory scheme or the purpose of the ACA. For example, the

---

[15] To the extent that HHS now argues in its briefing that the statute's language of "separate payments" *requires* separate transactions, that is not reflected in the final rule. In their motion for summary judgment, the defendants state that the plaintiffs "fail to challenge HHS's conclusion that 'separate payment[s]' require separate transactions, and that requiring separate bills better aligns the regulations with Congress's intent to require separate transactions." (ECF 35-1, Mot. for Summary Judgment, at 24). But HHS explained in the final rule that "Section 1303 . . . [does] not specify the method a QHP issuer must use to comply with the separate payment requirement" and that "the previous methods of itemizing or providing advance notice about the amounts . . . arguably identifies two 'separate' amounts for two separate purposes." Final Rule, 84 FR at 71693. The import of this explanation is that the "separate payment" language does not mandate either separate transactions or separate billing, as HHS notes that "itemizing or providing advance notice about the amounts" is permissible under the statute, and neither of these methods would appear to result in separate transactions.

provision in which the "separate payment" language is contained is titled "Establishment of allocation accounts," and is in a larger section titled "Prohibition on the use of Federal funds," *see* 42 U.S.C. § 18023(b)(2), (b)(2)(B), indicating that Congressional intent was to make sure federal funds were not used for non-Hyde abortions, rather than to establish the particular method by which issuers should collect payments.  HHS also did not consider the overall purpose of the ACA "to increase the number of Americans covered by health insurance and decrease the cost of health care."  *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 538 (2012).

An adequate explanation of why the rule improves statutory alignment is especially important here, because improved alignment with the "separate payment" language is the only justification that HHS gave for the rule change.  As discussed above, HHS provides no evidence that issuers are not appropriately segregating funds in accordance with the statute and does not rely on compliance issues as a justification for the rule.  This is in contrast to the regulations at issue in *Rust v. Sullivan*, 500 U.S. 173, where the Supreme Court found that the Secretary justified abortion-related regulations promulgated under Title X with "reasoned analysis" where GAO and Office of Inspector General ("OIG") reports indicated that prior guidance failed to properly implement the statute, clearer guidance was needed, the new regulations were more aligned with Congressional intent, and were justified by client experience under the prior policy and a shift in public attitude.  *Id.* at 187.  Here, the only justification for the new rule that HHS gave was a summary statement that it was more consistent with the "separate payment" language.  *See Encino Motorcars*, 136 S. Ct. at 2126.

To be clear, the court does not hold that HHS was required to consider certain factors when determining Congressional intent, or that the failure to consider a specific factor or use a

25

specific tool of statutory construction renders the rule arbitrary and capricious.  But HHS must

provide a reasoned and adequately supported explanation for the rule.  Here, HHS has provided

virtually no explanation for finding that the "separate billing" rule is more consistent with

Congressional intent when it appears to acknowledge that the plain language of the statute does

not require it, when Congressional intent is the only justification for a rule that HHS

acknowledges will impose massive costs, and when HHS failed to consider *any* other factors that

traditionally have been used in determining Congressional intent.[16]

>    2.  Enforcement date

In the final rule, HHS adopted a six-month implementation deadline.  In light of the

COVID-19 pandemic, the implementation deadline was extended by sixty days, until August 26,

2020, by an Interim Final Rule. 85 FR 27550, 27599.  The parties have completed supplemental

briefing as to the new date.

In the December 2019 final rule, HHS stated that "we believe 6 months is sufficient for

State Exchanges performing premium billing and payment processing and QHP issuers to

implement the administrative and operational changes to billing processes necessary to comply

with this policy."  84 FR at 71689.  It stated that the 6-month implementation deadline

"appropriately prioritizes the goals of improved statutory alignment," *id.*, and further stated that

"we do not believe that potential implementation challenges in connection with a midyear

implementation date should outweigh numerous commenters' concerns regarding the lack of

transparency as to whether their QHP covers non-Hyde abortion services, transparency that

---

[16]Additionally, HHS did not consider what "separate payments" might mean in the insurance industry, although "[a]mbiguous language in statutes should be interpreted in light of background legal concepts and ordinary commercial practice."  *Rai v. WB Imico Lexington Fee, LLC*, 802 F.3d 353, 359 (2d Cir. 2015).  A comment by the Center on Budget and Policy Priorities stated that "[a]dministratively separating funds received through one payment transaction is commonplace; for example, insurance companies often offer 'bundled' coverage (such as life and health insurance) that combines two distinct types of coverage under one payment transaction."  Center on Budget and Policy Priorities Comment at 2, AR 081218.

would be delayed by approximately a year if compliance were required by the first day of the 2021 plan year." *Id.* at 71690.

The plaintiffs argue that the original six-month implementation deadline was arbitrary and capricious because it was contradicted by many of the comments expressing that issuers would need significantly longer to comply, and that implementation in the middle of the 2020 plan year would increase consumer confusion. HHS argues that it appropriately balanced between competing objectives, that this is the sort of value-laden decision making that deserves deference, *see Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2570 (2019), and that none of the commenters stated that it would be impossible to comply within six months. As to the revised deadline, the plaintiffs argue that it is unsupported by the record as issuers stated they need more time in light of COVID-19. HHS argues that while two specific issuers requested a longer extension, HHS properly balanced the increased burden of the COVID-19 pandemic with the countervailing interest of achieving better alignment with the intent of the statute.

The court finds that the original six-month implementation deadline is arbitrary and capricious because HHS "relied on factors which Congress has not intended it to consider." *State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 43. Here, HHS made it clear both in the final rule and during briefing that transparency regarding non-Hyde abortion coverage and premiums was merely an incidental benefit of the rule. Further, Section 1303(b)(3)(A) is a provision specific to disclosure and provides that issuers shall provide notice to enrollees of coverage of non-Hyde abortion services "only as part of the summary of benefits and coverage explanation, at the time of enrollment[.]" 42 U.S.C. § 18023(b)(3)(A). Section 1303(b)(3)(A) indicates that Congress did not intend transparency to be a factor to be considered in interpreting the "separate payment" requirement. But, transparency now appears to be one of the reasons proffered for the six-month

implementation date.  It makes little sense that transparency would not be a reason for

promulgation of the rule, but would be a reason for faster implementation of the rule.  And

although HHS also relied on improved statutory alignment in issuing a six-month

implementation deadline, it is not clear what "relative weight" HHS placed on transparency

concerns, and whether it would have chosen the same implementation time period based on the

benefit of improved statutory alignment alone.  *See Ergon-W. Virginia, Inc. v. United States

Envtl. Prot. Agency*, 896 F.3d 600, 612 (4th Cir. 2018).

The feasibility of the six-month implementation deadline is also contradicted by the

record, as many issuers stated they would need a significantly longer time to comply.  For

example, BCBSA stated that "most issuers would need up to two years for implementation."

BCBSA Comment at 4, AR 080264.  BCBSA explained that "many issuers do not have the

ability to generate two separate bills for one policy, requiring them to have to issue two policies

per subscriber.  Not only would this be an extraordinarily costly and difficult change for such

issuers to make, exchanges would have to send separate enrollment transactions to these QHPs –

one for non-Hyde services and one for all other services provided by the selected coverage." *Id.*

AHIP surveyed 18[17] issuers or vendors who conduct billing and payments for issuer clients

regarding estimated time of implementation.  In that survey, the majority (8) estimated 18

months, 4 estimated longer than 18 months, 4 estimated 12 months, and only 2 estimated 6

months.  AHIP Comment at 17, AR 080221.  AHIP also identified the numerous steps an issuer

would have to take to comply with the "separate billing" requirement.  Comment at 10–11, 18–

19, AR 080214–15, 080222–23.  Connect for Health, the Colorado exchange program, submitted

a comment stating that "[w]e also note that a mid-year implementation may not allow for state

---

[17] AHIP surveyed 19 issuers/vendors, 10 of which would have to comply with the rule.  Comment at 16, AR
080220.  AHIP received 18 responses regarding estimated time of implementation.  Comment at 17 n.15, AR
080221.  It is not clear if the issuer/vendor that did not respond has to comply with the rule.

regulators to appropriately review potentially required changes to issuer policy forms and other plan documents." Connect for Health Colorado Letter at 8, AR 081101.[18]

HHS, however, simply stated in the final rule that 6 months gave issuers and exchanges sufficient time to comply. Final Rule, 84 FR at 71689. But HHS failed to address the "specific, contradictory evidence" that stakeholders would need more time to comply. *Ergon-W. Virginia, Inc.*, 896 F.3d at 613. In its briefing HHS argues that the comments did not offer a sufficient explanation for the estimates of how long it would take to comply. That appears to be incorrect, however, as the various comments did explain the many steps issuers and exchanges would need to take to start implementing the "separate billing" rule.

Further, even with the sixty days added by the interim final rule, this would give issuers eight months to comply, which a majority of issuers who provided estimates stated would not be enough time. Providing only eight months for implementation appears particularly inadequate in light of the challenges posed by COVID-19. Further, as the plaintiffs argue, HHS did not address certain specific concerns arising from the COVID-19 pandemic, including numerous individuals entering the exchange because of job loss, and the impact this might have on the costs of implementing the final rule. American College of Obstetricians and Gynecologists ("ACOG") Comment at 2, IFR-AR 158.

The court notes that HHS stated it would exercise enforcement discretion as to issuers attempting in good faith to comply with the rule. In the interim final rule extending the implementation date due to COVID-19, HHS stated that "[w]e do not anticipate that HHS would

---

[18] Additionally, commenters explained that implementation in the middle of the 2020 plan year would increase consumer confusion. For example, the National Association of Insurance Commissioners stated that "NAIC members do agree that instituting this requirement in the middle of a plan year would create undue burdens on many stakeholders," that a mid-plan year change would create consumer confusion, and that "as with nearly any change applicable [to] individual market issuers, [the separate billing requirement should] be made effective to coincide with the beginning of a plan year." NAIC letter at 1–2, AR 079065–66.

exercise such discretion for an Exchange or QHP issuer that fails to meet the separate billing requirements after more than 1 year following publication of the [final rule] or more than 6 months after the end of the COVID–19 [public health emergency] whichever comes later."  85 FR at 27600.  But for the reasons stated above, it is not clear if even this enforcement discretion for a year following publication or six months after the public health emergency will give issuers enough time to comply.  Nor is it clear to what extent enforcement discretion will be exercised, as it still requires HHS's determination that the issuer is acting in "good faith."

Accordingly, because HHS failed to consider and adequately address specific, contrary evidence from regulated stakeholders,  the implementation deadline is arbitrary and capricious. Additionally, as discussed above, the "separate billing" rule violates Section 1554 and also is arbitrary and capricious for failure to provide a reasoned explanation.  Because the court finds that the "separate billing" rule is not in accordance with law, as it violates Section 1554, and also is arbitrary and capricious for the reasons explained above, it need not address whether the rule violates Section 1303(b)(3)(A)[19] or whether the opt-out policy is separately unlawful.

## CONCLUSION AND SCOPE OF RELIEF

"[I]njunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs."  *Califano*, 442 U.S. at 702.  Here, the class consists of all enrollees in exchange plans who would be affected by the rule, exclusive of opt-outs.  There does not appear to be any way to provide relief to the entire class without vacating the rule, given that the class consists of approximately 3 million people throughout the country (minus opt-

---

[19] Section 1303(b)(3)(A) provides that "[a] qualified health plan that provides for coverage of the services described in paragraph (1)(B)(i) [non-Hyde abortion services] shall provide a notice to enrollees, only as part of the summary of benefits and coverage explanation, at the time of enrollment, of such coverage." 42 U.S.C. § 18023(b)(3)(A).

outs).  Therefore, the court will order that the "separate billing" rule be vacated and the defendants be enjoined from requiring its implementation.

In summary, for the reasons stated above, the court will grant the plaintiffs' motion to amend, their motion for class certification, and their motion for summary judgment.  The defendants' motion for summary judgment will be denied.  The "separate billing" rule, which is contrary to Section 1554 of the ACA and is arbitrary and capricious, will be vacated and its enforcement will be enjoined.  A separate order follows.


___7/10/20_____                                 _____/s/_____
Date                                                                 Catherine C. Blake
                                                                     United States District Judge